**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA, ex rel.
MARY HENDOW; JULIE ALBERTSON,
    *Plaintiffs-Appellants,*

    v.

UNIVERSITY OF PHOENIX,
    *Defendant-Appellee.*

No. 04-16247

D.C. No.
CV-03-00457-GEB

OPINION

Appeal from the United States District Court
for the Eastern District of California
Garland E. Burrell, District Judge, Presiding

Argued and Submitted
February 15, 2006—San Francisco, California

Filed September 5, 2006

Before: Cynthia Holcomb Hall, Barry G. Silverman, and
Susan P. Graber, Circuit Judges.

Opinion by Judge Hall

10657

**COUNSEL**

Nancy G. Krop, Law Offices of Nancy G. Krop, Burlingame, California, for the plaintiffs-appellants.

Timothy J. Hatch, Gibson, Dunn & Crutcher LLP, Los Angeles, California, for the defendant-appellee.

Charles W. Scarborough, Department of Justice, Civil Division, Washington, DC, for the amicus.

**OPINION**

HALL, Senior Circuit Judge:

The False Claims Act makes liable anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2). In this case, relators have raised allegations that the University of Phoenix knowingly made false statements, and caused false statements to be made, that resulted in the payment by the federal Department of Education of hundreds of millions of dollars. Despite this axiomatic fit between the operative statute and the allegations made, respondent claims that relators' legal theory holds no water. The district court agreed, dismissing the suit for failure to state a claim upon which relief can be granted. We reverse.

I.

When an educational institution wishes to receive federal subsidies under Title IV and the Higher Education Act, it must enter into a Program Participation Agreement with the Department of Education (DOE), in which it agrees to abide by a panoply of statutory, regulatory, and contractual requirements. One of these requirements is a ban on incentive compensation: a ban on the institution's paying recruiters on a per-student basis. The ban prohibits schools from "provid[ing] any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." 20 U.S.C. § 1094(a)(20). This requirement is meant to curb the risk that recruiters will "sign up poorly qualified students who will derive little benefit from the subsidy and may be unable or unwilling to repay federally guaranteed loans." *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916

(7th Cir. 2005), *cert. denied*, 126 S.Ct. 1786 (2006). The ban was enacted based on evidence of serious program abuses. *See* S. Rep. No. 102-58, at 8 (1991) ("Abuses in Federal Student Aid Programs") (noting testimony "that contests were held whereby sales representatives earned incentive awards for enrolling the highest number of student[s] for a given period"); H.R. Rep. No. 102-447, at 10, *reprinted in* 1992 U.S.C.C.A.N. 334, 343 (noting that the "new provisions include prohibiting the use of commissioned sales persons and recruiters").

This case involves allegations under the False Claims Act that the University of Phoenix (the University) knowingly made false promises to comply with the incentive compensation ban in order to become eligible to receive Title IV funds. Appellants, Mary Hendow and Julie Albertson (relators), two former enrollment counselors at the University, allege that the University falsely certifies each year that it is in compliance with the incentive compensation ban while intentionally and knowingly violating that requirement. Relators allege that these false representations, coupled with later claims for payment of Title IV funds, constitute false claims under 31 U.S.C. § 3729(a)(1) & (a)(2).

First, relators allege that the University, with full knowledge, flagrantly violates the incentive compensation ban. They claim that the University "compensates enrollment counselors . . . based directly upon enrollment activities," ranking counselors according to their number of enrollments and giving the highest-ranking counselors not only higher salaries but also benefits, incentives, and gifts. Relators allege that the University also "urges enrollment counselors to enroll students without reviewing their transcripts to determine their academic qualifications to attend the university," thus encouraging counselors to enroll students based on numbers alone. Relator Albertson, in particular, alleges that she was given a specific target number of students to recruit, and that upon reaching that benchmark her salary increased by more than

$50,000. Relator Hendow specifically alleges that she won trips and home electronics as a result of enrolling large numbers of students.

Second, relators allege considerable fraud on the part of the University to mask its violation of the incentive compensation ban. They claim that the University's head of enrollment openly brags that "[i]t's all about the numbers. It will always be about the numbers. But we need to show the Department of Education what they want to see." To deceive the DOE, relators allege, the University creates two separate employment files for its enrollment counselors—one "real" file containing performance reviews based on improper quantitative factors, and one "fake" file containing performance reviews based on legitimate qualitative factors. The fake file is what the DOE allegedly sees. Relators further allege a series of University policy changes deliberately designed to obscure the fact that enrollment counselors are compensated on a per-student basis, such as altering pay scales to make it less obvious that they are adjusted based on the number of students enrolled.

Third and finally, relators allege that the University submits false claims to the government. Claims for payment of Title IV funds can be made in a number of ways, once a school signs its Program Participation Agreement and thus becomes eligible. For instance, in the Pell Grant context, students submit funding requests directly (or with school assistance) to the DOE. In contrast, under the Federal Family Education Loan Program, which includes Stafford Loans, students and schools jointly submit an application to a private lender on behalf of the student, and a guaranty agency makes the eventual claim for payment to the United States only in the event of default. Relators allege that the University submits false claims in both of these ways. They claim that the University, with full knowledge that it is ineligible for Pell Grant funds because of its violation of the incentive compensation ban, submits requests for those funds directly to the DOE, resulting in a

direct transfer of the funds into a University account. They further claim that the University, again with knowledge that it has intentionally violated the incentive compensation ban, submits requests to private lenders for government-insured loans.

On May 20, 2004, the district court dismissed the relators' complaint with prejudice under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Relators appealed on June 15, 2004. The United States Department of Justice submitted a brief as amicus curiae supporting the reversal of the district court. Because this case comes to us on a motion to dismiss, we assume that the facts as alleged are true, and examine only whether relators' allegations support a cause of action under the False Claims Act under either of two possible theories. *See Zimmerman v. City of Oakland*, 255 F.3d 734, 737 (9th Cir. 2001) ("We review dismissals under Rule 12(b)(6) *de novo*, accepting as true all well-pleaded allegations of fact in the complaint and construing them in the light most favorable to the plaintiffs."). We hold that they do, and that either theory is viable.

## II.

The district court below rejected both of relators' theories for why they have validly alleged that the University submitted false or fraudulent claims to the government in violation of the False Claims Act. First, the court rejected relators' claim under the "false certification" theory, as treated by this court in *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996), because the operative statute here "only requires that [the University] enter into an agreement, and does not require a certification." Second, the district court rejected relators' claim under the "promissory fraud" theory, because they did not "identif[y] any certification which is a prerequisite for [the University] to receive federal funds." These rulings conflated the proper analysis of False Claims

Act liability, and so we will discuss the relevant theories in more detail.

**[1]** In an archetypal *qui tam* False Claims action, such as where a private company overcharges under a government contract, the claim for payment is itself literally false or fraudulent. *See Anton*, 91 F.3d at 1266. The False Claims Act, however, is not limited to such facially false or fraudulent claims for payment. *See id*. Rather, the False Claims Act is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). More specifically, in amending the False Claims Act in 1986, Congress emphasized that the scope of false or fraudulent claims should be broadly construed:

> [E]ach and every claim submitted under a contract, loan guarantee, or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim.

S. Rep. No. 99-345, at 9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274.

**[2]** The principles embodied in this broad construction of a "false or fraudulent claim" have given rise to two doctrines that attach potential False Claims Act liability to claims for payment that are not explicitly and/or independently false: (1) false certification (either express or implied); and (2) promissory fraud. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).

*A.   False Certification*

Many different courts have held that a claim under the False Claims Act can be false where a party merely falsely

certifies compliance with a statute or regulation as a condition to government payment. *See*, *e.g.*, *id.* at 786; *Mikes v. Straus*, 274 F.3d 687, 697-700 (2d Cir. 2001); *United States ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 441 (3d Cir. 2004). The leading case on false certification in the Ninth Circuit is *United States ex rel. Hopper v. Anton.*

In *Anton*, a relator-plaintiff brought a False Claims Act suit against the Los Angeles Unified School District (LAUSD) for allegedly submitting false claims for federal funds while in knowing violation of an underlying statute granting funds for special education programs (the Individuals with Disabilities Education Act, "IDEA"). 91 F.3d at 1263. In particular, the relator alleged that LAUSD's method of evaluating potential student eligibility for the program violated the IDEA. *Id.* LAUSD allegedly (1) submitted forms stating the number of eligible students in the district; (2) cashed checks that were partially comprised of federal funds; and (3) submitted triennial certifications averring that LASUD " 'will meet all applicable requirements of state and federal law and regulations,' including 'general compliance' with the IDEA." *Id.* at 1265. We held that False Claims Act liability can attach under the theory of false certification, although the relators had not presented sufficient evidence of fraud. *Id.*

**[3]** In *Anton*, we explained the theory of false certification, identifying two major considerations: " '(1) whether the false statement is the cause of the Government's providing the benefit; and (2) whether any relation exists between the subject matter of the false statement and the event triggering Government's [sic] loss.' " *Id.* at 1266 (quoting John T. Boese, *Civil False Claims and Qui Tam Actions* 1-29 to 1-30 (1995)). We also held that "[m]ere regulatory violations do not give rise to a viable FCA action," but rather, "[i]t is the false *certification* of compliance which creates liability when certification is a prerequisite to obtaining a government benefit." *Id.* at 1266-67 (emphasis in original). From the principles underlying these two statements, we created four conditions necessary to

succeed on the false certification theory of False Claims Act liability.

First, we emphasized the necessity of a *false* claim, rather than a mere unintentional violation. We did not hold in *Anton* that regulatory violations will go unchecked by the False Claims Act, but we did agree with the lower court's reasoning that for a "breach of contract, or violation of regulations or law, or receipt of money from the government" to give rise to an action under the False Claims Act, "[i]t requires a false claim." 91 F.3d at 1265. We went on to note that the "fatal defect" in *Anton* was not that the claimed infraction was a regulatory violation, but that there was a "lack of a false claim." *Id*. at 1267. Thus, we established that to succeed on a false certification theory, some falsity must be alleged.

Second, we emphasized the central importance of the scienter element to liability under the False Claims Act, holding that false claims must in fact be "false when made." *Id*. (citing *United States v. Shah*, 44 F.3d 285, 290 (5th Cir. 1995)). In fact, we held, "[f]or a certified statement to be 'false' under the Act, it must be an intentional, palpable lie." *Id*. (citing *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1478 (9th Cir. 1996)). We also noted that "some request for payment containing falsities made with scienter (i.e., with knowledge of the falsity and with intent to deceive) must exist." *Id*. at 1265. In short, we made clear that a palpably false statement, known to be a lie when it is made, is required for a party to be found liable under the False Claims Act.

**[4]** We note that the University and the district court below have taken our holdings to mean that the word "certification" has some paramount and talismanic significance, apparently believing that a palpably false *statement* does not bring with it False Claims liability, while a palpably false *certification* will. This facile distinction would make it all too easy for claimants to evade the law. The Fourth Circuit rightly noted that False Claims liability attaches "*because of the fraud* sur-

rounding the efforts to obtain the contract or benefit status, or the payments thereunder." *Harrison*, 176 F.3d at 788 (emphasis added). That the theory of liability is commonly called "false certification" is no indication that "certification" is being used with technical precision, or as a term of art; the theory could just as easily be called the "false statement of compliance with a government regulation that is a precursor to government funding" theory, but that is not as succinct. Furthermore, because the word "certification" does not appear in 31 U.S.C. § 3729 (a)(1) or (a)(2), there is no sense in parsing it with the close attention typically attending an exercise in statutory interpretation. So long as the statement in question is knowingly false when made, it matters not whether it is a certification, assertion, statement, or secret handshake; False Claims liability can attach.

Third, we held that the false statement or course of conduct must be material to the government's decision to pay out moneys to the claimant. This is plain from our focus on "(1) whether the false statement is the cause of the Government's providing the benefit; and (2) whether any relation exists between the subject matter of the false statement and the event triggering Government's [sic] loss." *Anton*, 91 F.3d at 1266. We also stated that the relevant certification of compliance must be both a "prerequisite to obtaining a government benefit," *id.*, and a "*sine qua non* of receipt of [government] funding," *id.* at 1267. We further held that the government funding must be "conditioned" upon certifications of compliance. *Id.*

This approach has been followed by a number of other circuits to adopt the false certification theory of false claims liability.[1] *See Mikes*, 274 F.3d at 699 (holding that false

---

[1] Some courts, such as the Court of Federal Claims, have adopted a version of the false certification theory whereby the certification need only be implied, rather than express. In those cases, if a party submits a claim for payment under a government program with requirements for participa-

certification theory applies when "governing federal rules . . . are a precondition to payment"); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997) (holding that false claims liability attaches only "where the government has conditioned payment of a claim upon a claimant's certification of compliance with . . . a statute or regulation"); *Ab-Tech Constr., Inc. v. United States*, 31 Fed. Cl. 429, 434 (Fed. Cl. 1994) (holding that false statement of compliance must be "critical to the decision to pay"), *aff'd*, 57 F.3d 1084 (Fed. Cir. 1995). Once again, we note that there is no special significance to the term "certification" in determining materiality; the question is merely whether the false certification—or assertion, or statement— was relevant to the government's decision to confer a benefit.

Fourth and most obviously, for a false statement or course of action to be actionable under the false certification theory of false claims liability, it is necessary that it involve an actual *claim*, which is to say, a call on the government fisc. This is self-evident from the statutory language, of course, which requires a "claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2). In *Anton*, the case involved direct receipt of federal funding, but we agree with the Fourth Circuit that a claim arises whenever the government is asked to "pay out money or to forfeit moneys due." *Harrison*, 176 F.3d at 788.

## B. Promissory Fraud

[5] Another approach to finding False Claims Act liability in the absence of an explicitly false claim is the "promissory fraud" or "fraud-in-the-inducement" theory. This theory,

---

tion, that claim is taken as an implied certification that the party was in compliance with those program requirements. *See Ab-Tech Constr., Inc. v. United States*, 31 Fed. Cl. 429, 434 (Fed. Cl. 1994). Here, we need not address the viability of this theory, because it is beyond dispute that the University signed the written Program Participation Agreement, thus making an express statement of compliance.

rather than specifically requiring a false statement of compliance with government regulations, is somewhat broader. It holds that liability will attach to each claim submitted to the government under a contract, when the contract or extension of government benefit was originally obtained through false statements or fraudulent conduct. *See*, *e.g.*, *id.*, 176 F.3d at 787; *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 542 (1943). In *Hess*, the Supreme Court found contractors liable under the False Claims Act for claims submitted under government contracts that the defendants obtained via collusive bidding. *Id.* The Court determined that "[t]his fraud did not spend itself with the execution of the contract," and so each claim submitted under the contracts constituted a false or fraudulent claim. *Id.* at 543. In other words, subsequent claims are false because of an *original fraud* (whether a certification or otherwise).

The Seventh Circuit recently adopted a version of the promissory fraud theory in a case almost identical to this one, *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914 (7th Cir. 2005), *cert. denied*, 126 S Ct. 1786 (2006). Relators in *Main* alleged liability under the False Claims Act based on an Oakland City University representation that it would comply with the incentive compensation ban, despite its knowledge of the ban and intent not to comply. *See id.* at 916. As here, the district court dismissed the case for failure to state a claim, ruling that even willful falsehoods in a "phase-one application" do not violate the False Claims Act, because such an application requests a declaration of eligibility rather than an immediate payment from the treasury. *See id.* The district court further ruled that the "phase two" applications for funds are not false, because they do not repeat the assurance that the University abides by the rule against paying contingent fees to recruiters. *See id.*

**[6]** The Seventh Circuit reversed, analyzing the claim under a promissory fraud theory, and holding that the relators had stated a claim based upon allegations of fraud in the induce-

ment of the original Program Participation Agreement. *See id.* The court did not address the false certification theory directly, although it implicitly recognized that the district court had rejected relator's arguments on that ground. Pursuant to the plain language of 31 U.S.C. § 3729(a)(2), the court determined that False Claims Act liability was clear: "[t]he University 'uses' its phase-one application (and the resulting certification of eligibility) when it makes (or 'causes' a student to make or use) a phase-two application for payment. No more is required under the statute." *Id.*

**[7]** We find the Seventh Circuit's reasoning in adopting the promissory fraud theory persuasive. We also note that the promissory fraud theory, in substance, is not so different from the false certification theory, and even requires the same elements. For instance: first, a claim must be false and, second, that falsity must be knowingly perpetrated. The Seventh Circuit opined eloquently on this point:

> To prevail in this suit [relator] must establish that the University not only knew . . . that contingent fees to recruiters are forbidden, but also planned to continue paying those fees while keeping the Department of Education in the dark. This distinction is commonplace in private law: failure to honor one's promise is (just) breach of contract, but making a promise that one *intends* not to keep is fraud. . . . [I]f the University knew about the rule and told the Department that it would comply, while planning to do otherwise, it is exposed to penalties under the False Claims Act.

*Id*. at 917 (emphasis in original) (citations omitted). We, too, have held that for promissory fraud to be actionable under the False Claims Act, "the promise must be false when made." *Anton*, 91 F.3d at 1267. We have also noted that "[i]nnocent mistakes, mere negligent misrepresentations and differences in interpretations" are not sufficient for False Claims Act lia-

bility to attach. *Id.* In short, therefore, under a promissory fraud theory, relator must allege a false or fraudulent course of conduct, made with scienter.

Third, as with the false certification theory, the promissory fraud theory requires that the underlying fraud be material to the government's decision to pay out moneys to the claimant. The Seventh Circuit in *Main* stated that the False Claims Act requires "a causal rather than a temporal connection between fraud and payment," 426 F.3d at 916, and we agree. And fourth and finally, there must exist a *claim*—a call on the government fisc. As the Seventh Circuit rightly noted, the precise logistical details of how the claim is made—with respect to timing, for instance, or the number of stages involved—are immaterial: "[i]f a false statement is integral to a causal chain leading to payment, it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork." *Id.* In other words, for there to exist a "claim" for purposes of False Claims Act liability, it must involve merely some sort of request for the government to pay out money or forfeit moneys due.

### III.

**[8]** Thus, as the above analysis shows, under either the false certification theory or the promissory fraud theory, the essential elements of False Claims Act liability remain the same: (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due. The question remaining is whether relators in this case have alleged facts satisfying all four of these elements.

### A.  *Falsity*

**[9]** Relators allege a false statement or course of conduct. They allege that the University violates a statutory requirement, the incentive compensation ban, to which it agreed in

writing in the Program Participation Agreement. They allege that the University establishes policies of violating that requirement, and encourages its employees to violate that requirement. They allege specific instances of violation, where higher salaries, benefits, and incentives were given in response to increased enrollment. And they allege that the University did so knowingly, and with the specific intent to deceive the government. Thus, relators properly allege a false statement or course of conduct.

## B.   Scienter

[10] Relators allege a false statement or course of conduct made knowingly and intentionally. They allege that University staff openly bragged about perpetrating a fraud, that the University had an established infrastructure to deceive the government, and that the University repeatedly changed its policies to hide its fraud. In other words, relators allege that the University provided statements to the government that were "intentional, palpable lie[s]," made with "knowledge of the falsity and with intent to deceive." *Anton*, 91 F.3d at 1265, 1267.

[11] The University argues that the incentive compensation ban is nothing more than one of hundreds of boilerplate requirements with which it promises compliance. This may be true, but fraud is fraud, regardless of how "small." The University is worried that our holding today opens it up to greater liability for innocent regulatory violations, but that is not the case—as we held above, innocent or unintentional violations do not lead to False Claims Act liability. But that is no reason to innoculate institutions of higher education from liability when they *knowingly* violate a regulatory condition, with the intent to deceive, as is alleged here. Relators properly allege false statements or courses of conduct made with scienter.

## C.   Materiality

Most of the argument in this case centers on whether and how much the University's alleged fraud was material to the

government's decision to disburse federal funds. The parties argue at length over, for instance, the enforcement power of the DOE, and whether its authority to take "emergency action"—to withhold funds or impose sanctions where it has information that statutory requirements are being violated—means that the statutory requirements are causally related to its decision to pay out moneys due.

**[12]** These questions of enforcement power are largely academic, because the eligibility of the University under Title IV and the Higher Education Act of 1965—and thus, the funding that is associated with such eligibility—is *explicitly* conditioned, in three different ways, on compliance with the incentive compensation ban. First, a federal statute states that in order to be eligible, an institution must

> enter into a program participation agreement with the Secretary [of Education]. The agreement *shall condition* the initial and continuing eligibility of an institution to participate in a program *upon compliance* with the following requirements . . . [including the incentive compensation ban.]

20 U.S.C. § 1094(a) (emphasis added). Second, a federal regulation specifies:

> An institution may participate in any Title IV, HEA program . . . *only if* the institution enters into a written program participation agreement with the Secretary . . . . A program participation agreement *conditions* the initial and continued participation of an eligible institution in any Title IV, HEA program *upon compliance* with the provisions of this part [such as the incentive compensation ban.]

34 C.F.R. § 668.14(a)(1) (emphasis added). Third and finally, the program participation agreement itself states:

> The execution of this Agreement [which contains a reference to the incentive compensation ban] by the Institution and the Secretary is a *prerequisite* to the Institution's initial or continued participation in any Title IV, HEA program.

(emphasis added). All of the emphasized phrases in the above passages demonstrate that compliance with the incentive compensation ban is a necessary condition of continued eligibility and participation: compliance is a "prerequisite" to funding; funding shall occur "only if" the University complies; funding shall be "condition[ed] . . . upon compliance." These are not ambiguous exhortations of an amorphous duty. The statute, regulation, and agreement here all explicitly condition participation and payment on compliance with, among other things, the precise requirement that relators allege that the University knowingly disregarded.

The University argues that the ban is merely a condition of *participation*, not a condition of *payment*. But in this case, that is a distinction without a difference. In the context of Title IV and the Higher Education Act, if we held that conditions of participation were not conditions of payment, there would be no conditions of payment at all—and thus, an educational institution could flout the law at will.

To see why this is so, one only need look at the University's semantic argument, in which it claims that for a condition of participation, an institution says it " '*will*' comply" with various statutes and regulations, but for a condition of payment, an institution says that it "*has* complied." This grammatical haggling is unmoored in the law, and it is undercut by the Program Participation Agreement itself. In the section that the University concedes contains conditions of payment—the section entitled "Certifications Required From Institutions"—the University agrees that it "will" or "shall" comply with various regulations no less than six times. Under the University's logic, these future-tense assertions could not be conditions of

payment, and yet it concedes that they are. Its concession is correct; these, and all other promises to comply with the Program Participation Agreement, are conditions of payment. These conditions are also "prerequisites," and "the *sine qua non*" of federal funding, for one basic reason: if the University had not agreed to comply with them, it would not have gotten paid.

Furthermore, we take the University's argument to mean that it believes if it had signed an agreement that stated "the University of Phoenix certifies that it has complied with the incentive compensation ban," then it would have signed a condition of payment. But the DOE and the United States Congress, as evidenced by the statutes, regulations, and contracts implementing the Title IV and Higher Education Act requirements for funding, quite plainly care about an institution's ongoing conduct, not only its past compliance. For purposes of federal funding, the University is not permitted to merely have a history of compliance with the applicable regulations; it must also agree to comply in the future. The Program Participation Agreement, constraining its ongoing conduct, is the condition of payment that the federal government requires—a promise that the University shall not break the law, not merely an assertion that it has not broken the law *yet*. If such promises were not conditions of payment, the University would be virtually unfettered in its ability to receive funds from the government while flouting the law. This cannot be what Congress and the DOE intend when they ask institutions to sign Program Participation Agreements.

Nor was such laissez-faire compliance what the Second Circuit had in mind, we think, when it developed the "participation versus payment" distinction in the first place. The case in which that distinction was first mentioned, *Mikes v. Straus*, is completely distinguishable from the case before us. There, in the Medicare context, the defendant was subject to a statutory requirement that stated:

"[i]t shall be the obligation" of a practitioner who provides a medical service "for which payment may be made . . . to assure" compliance with [42 U.S.C. § 1320c-5(a)].

274 F.3d. at 701. "Compliance," in that instance, meant maintaining an appropriate standard of care, which was ensured by peer review and extensive monitoring. Dereliction of that duty would result in sanctions only where "a violation was especially gross and flagrant." *Id*. at 702. Defendants were accused of not maintaining the appropriate standard of care, but the Second Circuit held that such a violation could not constitute a breach of a condition of payment under the Medicare statute. This makes sense for two interrelated reasons. First, the statutory duty was not to promise *compliance*, but to promise *assurance* of compliance. The fact that defendants did not meet the appropriate standard of care does not necessarily mean that they were ignoring their duty to try their best to comply; rather, it may have indicated merely that they were not doing a very good job. If the allegation had been that the defendants in *Mikes* were not even trying to comply—that they were not only failing to provide the appropriate standard of care, but also affirmatively and knowingly choosing not to —we imagine the *Mikes* case would have come out differently.

And even if it would not have, the *Mikes* court was dealing with the Medicare context, to which the court specifically confined its reasoning. *Id*. at 700. It imposed an additional requirement on Medicare cases: that the underlying statute "expressly" condition payment on compliance. An explicit statement, however, is not necessary to make a statutory requirement a condition of payment, and we have never held as much.

**[13]** Therefore, because relators have alleged that the University fraudulently violated a regulation upon which payment is expressly conditioned in three different ways, we hold that

they have properly alleged the University engaged in statements or courses of conduct that were *material* to the government's decision with regard to funding.

## D.   Claim

**[14]** Finally, relators allege that the University submitted a claim against the government fisc. Relators allege that the University submits false claims in a number of ways—either by submitting requests for Pell Grant funds directly to DOE, resulting in a direct transfer of the funds into a University account, or by submitting requests to private lenders for government-insured loans. We agree with the Seventh Circuit that "it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork." *Main*, 426 F.3d at 916. All that matters is whether the false statement or course of conduct causes the government to "pay out money or to forfeit moneys due." *Harrison*, 176 F.3d at 788. Relators have properly alleged that the University submitted a claim, for purposes of False Claims Act liability.

## IV.

Accordingly, because relators in this case have properly alleged (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due, their cause of action under the False Claims Act survives a motion to dismiss, and the decision of the district court is

**REVERSED.**