Philip MARSTELLER, for the use and benefit of the United States of America, Robert Swisher, for the use and benefit of the United States of America, Plaintiffs-Appellants,

v.

Lynn TILTON, Patriarch Partners, LLC, MD Helicopters, Inc., Norbert Vergez, Defendants-Appellees.

No. 16-11997

United States Court of Appeals, Eleventh Circuit.

(January 26, 2018)

Phillip Eugene Benson, Warren-Benson Law Group, MINNETONKA, MN, Lisa Rosano, Phillip Paul Weidner & Associates, ANCHORAGE, AK, for Plaintiffs-Appellants.

Christopher Nicholas Manning, Alexis A. Lien, Edward Charles Reddington, Kristin Ann Shapiro, U.S. House of Representatives, Office of General Counsel, WASHINGTON, DC, Anthony Aaron Joseph, Ralph Harrison Smith, III, Maynard Cooper & Gale, PC, BIRMINGHAM, AL, for Defendants-Appellees LYNN TILTON, PATRIARCH PARTNERS, LLC, MD HELICOPTERS, INC.

Anne M. Chapman, Lee Stein, Anna H. Finn, Mitchell Stein Carey, PC, PHOENIX, AZ, Stephanie Fleischman Cherny, SCOTTSDALE, AZ, for Defendant-Appellee NORBERT VERGEZ.

Benjamin M. Shultz, U.S. Attorney General's Office, WASHINGTON, DC, Amicus Curiae for UNITED STATES OF AMERICA.

Before WILLIAM PRYOR, JORDAN, and RIPPLE,* Circuit Judges.

* Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting by designation.

RIPPLE, Circuit Judge:

Relators Philip Marsteller and Robert Swisher brought this action against their former employer, MD Helicopters ("MD"), and codefendants Patriarch Partners ("Patriarch"), Lynn Tilton, and Colonel Norbert Vergez, under the *qui tam* provision of the False Claims Act ("FCA" or "Act"), 31 U.S.C. §§ 3729–30.[1] The allegations of the complaint concern a series of contracts between the United States Army ("the Army") and MD for the purchase and support of military helicopters. The complaint alleges that the defendants misled the Government by providing material false or incomplete information at two points in the transactional relationship, MD's pre-contract representations to the Government to enter the contracts and MD's submission of claims for payment. The complaint also describes other improprieties between Col. Vergez, then a representative of the Army, and the remaining defendants. These alleged improprieties included gifts and an offer of prospective employment.

In the district court, the defendants moved under Federal Rules of Civil Procedure 12(b)(6) and 9(b) for dismissal for failure to state a claim. They asserted that the complaint failed the specificity requirements applicable to allegations of fraud and that, in any event, the claims did not adequately state a case for liability. The district court granted the motion. It concluded that the complaint failed to establish liability under the implied certification theory, because the relators had not alleged adequately that a defendant had violated an express condition of payment or a material contractual requirement. The district court also concluded that the relators did not plead a fraud in the inducement theory, but that, if they had, it would have

failed for the same reasons as the implied certification theory.

The relators have appealed. During the pendency of this appeal, the Supreme Court has examined the implied certification theory in *Universal Health Services, Inc. v. United States ex rel. Escobar*, —— U.S. ——, 136 S.Ct. 1989, 195 L.Ed.2d 348 (2016). We conclude that the district court must revisit whether the relators alleged facts sufficient to support a theory of implied certification as articulated in *Escobar*. We also conclude that the complaint did plead fraud in the inducement, and we therefore remand so that the district court can reexamine the allegations relating to that theory.

Accordingly, we vacate the judgment of the district court and remand for further proceedings consistent with this opinion.

## I

## BACKGROUND

### A.

The allegations of the complaint concern a series of specific contracts between MD, an Arizona corporation that manufacturers high-performance helicopters, and the Army. The relators, Mr. Marsteller and Mr. Swisher, are the former Director of Sales and Marketing and the former Director of Military Business Development, respectively, for MD. Both are also Army veterans; indeed, Mr. Swisher remains a Major in the Army Individual Ready Reserve. At all times relevant to this action, Ms. Tilton has been CEO of MD and of Patriarch. Patriarch, which was founded and is wholly owned by Ms. Tilton, is a debt and equity investment and manage-

---

1. The complaint also alleged a conspiracy count, which was the only count to name Col. Vergez.

ment company and performs services for MD.

From 2010 to 2012, Col. Vergez was a project manager at the Army's Non-Standard Rotary Wing Aircraft Office ("NSRWA") in Huntsville, Alabama. NSRWA is responsible for the procurement and support of non-standard rotorcraft, including procurement for the foreign military sales program ("FMS") of the Department of Defense. In his role at NSRWA, Col. Vergez was personally and substantially involved in issuing, selecting, negotiating, pricing, and awarding FMS contracts.

The core of the complaint addresses five contracts between MD and the Army in 2011 and 2012. Under these agreements MD provided: (1) six helicopters to the Afghan Air Force, (2) logistical support to the Afghan Air Force, (3) three helicopters to the El Salvador Air Force, (4) two helicopters to the Government of Costa Rica, and (5) twelve helicopters to the Saudi Arabian National Guard. The forty-five-page complaint describes the interactions between MD and NSRWA on each of these bids and contracts. In describing several of the bid processes, the complaint alleges that the Army requested pricing data, presumably to establish the commercial reasonableness of the price proposed in MD's bid. The complaint alleges that MD cherry-picked the highest priced prior sales and omitted lower-dollar sales. With respect to one such contract, for example, the complaint asserts that, in response to the Army's request for a sales history,

> MD only provided the Army information regarding the October 11, 2011 sale of an MD 500E to the Columbus, Ohio

Police Department for the base price of $1,802,282, but did not disclose any other prior sales, including the May 20, 2011 sale of a new MD 500E helicopter to Fuchs Helikopter for the base price of $1,550,000. The Army relied on MD's incomplete disclosure and was deprived of its ability to effectively negotiate a reasonable and lower price which caused the agreed base price for each aircraft to be higher than it would have been if MD had fully complied with the Army's request for pricing data.[2]

With respect to another contract for helicopters for the Saudi Arabian National Guard, the complaint alleges that MD's Chief Operations Officer sent a draft bid to Ms. Tilton that included a price of $2,178,000 and noted that the base price for the aircraft was $2,150,000.[3] In replying to the email, Ms. Tilton asked, "Why is this not Army pricing?"[4] The COO then recommended raising the bid to $2,300,000, and Ms. Tilton immediately approved it. Mr. Marsteller, one of the relators in this action, alerted Ben Weiser, an executive vice president at MD, that he believed that the pricing was "criminal."[5] Weiser then contacted Ms. Tilton and asked her to "reconsider" the pricing, given that it was $150,000 more than the commercial list price that MD had published two-and-a-half months earlier.[6] Ms. Tilton declined to lower the price, explaining that her decision was "not about the money but about consistency with the Army."[7]

The complaint also contains allegations about Col. Vergez's relationship with MD and his dealings with Ms. Tilton. According to the allegations, although he previously had met other MD employees, Col.

**2.** R.57 at 18–19, ¶ 33.

**3.** The complaint alleges that MD did not disclose a sale for $1,900,000 during the prior year. *Id.* at 23, ¶ 50.

**4.** *Id.*

**5.** *Id.* at 24, ¶ 51.

**6.** *Id.*

**7.** *Id.*

Vergez first met Ms. Tilton at an industry event in March 2011, and informed her then that MD had won the bid to supply helicopters to the Afghan military. Ms. Tilton was impressed with Col. Vergez and began grooming him for a future role at MD; she also began traveling regularly to Huntsville to meet with him. She told MD's employees that he "got us this Afghan contract, he has great connections and he will drive our Army business."[8] From shortly after they met through early 2012, Col. Vergez brought Ms. Tilton or other MD employees into numerous conversations with Army personnel, including a meeting at the Pentagon with a Deputy Assistant Secretary of Defense. He also facilitated conversations with foreign officials and with private sector companies for MD. On Col. Vergez's recommendation, MD hired several staff people, including employees of other contractors and other retiring Army officers.[9] On one occasion, he provided Ms. Tilton with competition-sensitive information about forthcoming solicitations and leaked requests from a foreign government to NSRWA.

The complaint also alleges that Col. Vergez anticipated retirement from active service in late 2012. While his actions for MD's benefit were ongoing, Ms. Tilton and Col. Vergez discussed, over the course of approximately a year, his own future employment at MD or at Patriarch. In February 2012, Col. Vergez notified the Army of his disqualification from engaging in procurement activities involving MD because he had an offer of future employment from the company. During the following month, Col. Vergez participated in talks with MD and a private helicopter vendor, toured an MD facility with them, and signed in as a representative of the Army. In summer 2012, Col. Vergez signed a written employment contract with Patriarch to direct, at a salary more than double his military base pay, MD's Civil and Military Programs. Mr. Marsteller had a conversation with an MD manager during this period in which both agreed that the employment relationship was illegal.[10]

Col. Vergez took terminal leave status in November 2012, but remained on active duty until May 2013. In December 2012, during a plant-wide meeting, Ms. Tilton introduced him to MD employees as "a very special person who had been very influential in MD's receipt of Army contracts."[11] On February 1, 2013, the Colonel assumed a position as head of all of MD's programs, reporting directly to the COO, Schopfer. An internal organizational chart disclosed this arrangement, but to disguise the relationship, Col. Vergez was, on paper, a Patriarch employee with a Patriarch phone and email and receiving a Patriarch salary. In April 2013, Col. Vergez told one of the relators, Mr. Swisher, then an MD employee, that all military submissions were to go through him first. This directive provoked Mr. Swisher to resign over the improper relationship.[12]

---

8. *Id.* at 15, ¶ 25.

9. Among those recommended by Col. Vergez was Ben Weiser, the executive vice president who challenged Ms. Tilton on the Saudi Arabian National Guard contract.

10. It appears that the MD employees were concerned about the provisions of federal ethics laws applying to procurement officials and post-government employment with contractors. *See generally* 41 U.S.C. § 2104.

11. R.57 at 29, ¶ 66.

12. Subsequent to the filing of the complaint, Col. Vergez pleaded guilty to two counts of making false statements, in violation of 18 U.S.C. § 1001, and one count of conflict of interest, in violation of 18 U.S.C. §§ 208, 216(a)(2). Col. Vergez disputes the relevance of his guilty plea, which the relators submitted in the district court as an attachment to their brief in opposition to his motion to dismiss. Col. Vergez's brief on appeal discusses the circumstances of his conviction at some length. One of the convictions related to a failure to disclose his employment with MD

In its prayer for relief, the complaint also specifically alleges that, in submitting a bid and later in submitting invoices for payment, MD certified that it had complied with certain requirements applicable to government contractors, but that the company had no intention of complying with these requirements. Several of the counts also assert that, through lack of candor regarding both ethics and price disclosure requirements, MD deprived the Army of its ability to negotiate a reasonable price and, consequently, the Army agreed to terms it otherwise would not have.

### B.

In 2013, relators brought this *qui tam* action in the Northern District of Alabama. The United States declined to intervene. The defendants filed a motion to dismiss, and, prior to a ruling on that motion, the relators filed an amended complaint. The amended complaint sets forth the facts as we have just described them. It then set forth six claims for relief: five FCA claims, one for each of the contracts, and one additional conspiracy claim. The relators claimed that the defendants had not complied, nor intended to comply, with the Contractor Code of Business Ethics and Conduct ("Contractor Code of Ethics"), *see* 48 C.F.R. § 52.203-13, or with the Truth in Negotiations Act, 10 U.S.C. § 2306a. They also alleged that the defendants' implicit promise of compliance had influenced the Government's initial decision to enter into the contracts and its

later decision to pay out claims. The Defendants again moved to dismiss.

■ In ruling on the motion to dismiss the first amended complaint, the district court had to rule on the viability and possible scope of the implied certification theory. Under this theory, a party "impliedly certifies compliance with underlying contractual or statutory duties when submitting claims to the government" such that "[a] violation of those duties thus renders the claims false for purposes of the FCA." *United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 808 n.1 (11th Cir. 2015). In undertaking this task, the district court faced a daunting legal landscape. Our published cases "express[ed] no opinion as to the viability" of the implied certification theory. *Id.* To compound the district court's dilemma, our sister circuits disagreed on the validity and scope of the implied certification theory. The Seventh Circuit had rejected the theory entirely. *See United States v. Sanford-Brown, Ltd.*, 788 F.3d 696, 711–12 (7th Cir. 2015), *vacated sub nom. United States ex rel. Nelson v. Sanford-Brown, Ltd.*, —— U.S. ——, 136 S.Ct. 2506, 195 L.Ed.2d 836 (2016) (remanding for reconsideration in light of *Escobar*), *aff'd*, 840 F.3d 445 (7th Cir. 2016). Other courts, including the Second Circuit, had accepted it, but had cabined its application to "cases where defendants fail to disclose violations of expressly designated conditions of payment." *Escobar*, 136 S.Ct. at 1999 (citing *Mikes v. Straus*, 274 F.3d 687, 700 (2d Cir. 2001)). Still others, including the District of Columbia Circuit, had

---

on an ethics disclosure form and to disclose $30,000 in relocation expenses received from MD. Another of his convictions, for conflict of interest, relates to his involvement in negotiating favorable payment terms for MD in the Saudi Arabian National Guard contract after he had accepted an offer with an MD affiliate. The remaining count was unrelated to MD and this action. Following oral argument, the

parties also submitted judicial orders disposing of various other unrelated claims involving Ms. Tilton and her investment practices, including an SEC action resolved in her favor and a state court decision in Delaware resolved against her. None of these facts bears on our current assessment of the legal sufficiency of the complaint.

held "that conditions of payment need not be expressly designated as such to be a basis for False Claims Act liability." *Id.* (citing *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1269 (D.C. Cir. 2010)).

Because these pre-*Escobar* cases shed an important cross-light on the district court's decision and therefore aid substantially in our understanding of the course it chose, we pause briefly to review in somewhat more detail the different perspectives that formed the legal landscape at that time. We begin with the Second Circuit's decision in *Mikes v. Straus*, 274 F.3d 687 (2d Cir. 2001). *Mikes* involved an FCA claim by a dismissed employee of a pulmonology practice. She charged that her former employers did not maintain their equipment or perform certain tests consistent with industry-standard guidelines. She alleged that the defendants had expressly and impliedly certified compliance with these standards when submitting claims for reimbursement to the Medicare and Medicaid programs. The Second Circuit concluded that although the claims for payment certified that the tests were "medically necessary," that certification did not equate to an *express* certification that the tests were performed in compliance with industry standards. *Id.* at 698. While accepting the implied certification theory, the Second Circuit saw a danger in its being read "expansively and out of context." *Id.* at 699. In particular, the court believed the theory was a poor fit in the medical context; it saw a risk of "federaliz[ing] ... medical malpractice." *Id.* at 700. Accordingly, it decided to apply the theory "only when the underlying statute or regulation upon which the plaintiff relies *expressly* states the provider must comply in order to be paid." *Id.* (emphasis in original).

The District of Columbia Circuit took a different approach to implied certification. In *United States v. Science Applications International Corp.*, 626 F.3d 1257 (D.C. Cir. 2010), the underlying contract was between the Nuclear Regulatory Commission and the defendant, "a scientific, engineering, and technology applications company." *Id.* at 1261. The contract was "to provide technical assistance and expert analysis to support the agency's potential rulemaking" on the release of radioactive waste at a contamination level that was "below 'regulatory concern.' " *Id.* The contractual arrangement included "provisions designed to identify and prevent potential conflicts of interest," including requiring the defendant to forego outside contracts that created a conflict and to disclose any potential conflicts. *Id.* at 1262. Regulations defined these conflicts. In executing the contract, the defendant had certified compliance with the requirements, which the contract did not identify as conditions of payment. The defendant did not include an express certification of compliance when it later requested payment. In a subsequent FCA action alleging conflicts of interest involving the defendant's business, the District of Columbia Circuit rejected the *Mikes* approach. Instead, it adopted a rule that an FCA plaintiff may state a cause of action against a federal contractor who "withheld information about its noncompliance with material contractual requirements" and that "express contractual language specifically linking compliance to eligibility for payment" is not "a necessary condition." *Id.* at 1269.

The District of Columbia Circuit thereafter acknowledged that although the implied certification theory could be prone to abuse, any "concern can be effectively addressed through strict enforcement of the Act's materiality and scienter requirements." *Id.* at 1270.[13] Referring to the

---

**13.** The court provided an example to illustrate "[t]he logic of [its] conclusion" that the

express condition approach was too restric-

facts before it and to the issue of materiality, the court distinguished the conflict of interest rules from "any of 'potentially hundreds of legal requirements established by contract' " which were "minor" or "merely ancillary to the parties' bargain." *Id.* at 1271. It then cited record evidence that the conflict of interest obligations "were important to the overall purpose of the contract." *Id.* (quoting *United States v. Sci. Applications Int'l Corp.*, 653 F.Supp.2d 87, 103 (D.D.C. 2009), *aff'd in part and vacated in part*, 626 F.3d 1257 (D.C.Cir. 2010)).

Operating within this legal backdrop, the district court granted the motion. It decided that the amended complaint failed to state a claim under the general pleading standards of Rule 8 and, because the complaint alleged fraud, under the particularity requirements of Rule 9(b). Turning to the relators' implied certification theory of liability, the court considered the defen- dants' contention that "noncompliance with [a] statute or regulation may form the basis of an FCA claim under an implied certification theory only where the government expressly conditioned payment on compliance."[14] The Government, in its statement of interest filed in the district court, noted a recent trend away from the *Mikes* line of cases and urged the district court to follow those more recent authori- ties.[15]

The court declined the Government's suggestion to limit the restrictive reading of the implied certification theory found in *Mikes*. Instead, it relied on an unpublished decision of this court where we had de- scribed the implied certification theory as recognizing "that the FCA is violated where compliance with a law, rule, or regu- lation *is a prerequisite to payment*" and a participant makes a claim for payment de- spite a knowing failure to comply with that

---

tive, in a way that was "freed from the com- plexities" and "intricacies" of the case before it. *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1269 (D.C. Cir. 2010). The court surmised that the Government en- ters into a contract with a company that will provide gasoline with an octane rating of ninety-one or higher. The company provides noncompliant lower octane gasoline and seeks reimbursement on a form that nowhere requires certification of the octane level. An appropriate plaintiff could bring an FCA claim on these facts, the court noted, as the octane rating would be material to the con- tract even if not an express condition of pay- ment, and even if the company did not sepa- rately certify that it satisfied that requirement. Importantly, the discussion was not defining the outer limits of materiality, but merely demonstrating that an FCA action is available on an implied certification theory even absent an express designation as a condition of pay- ment, where the requirement plainly satisfies materiality.

14. R.77 at 9.

15. Specifically, the Government noted that several circuits had concluded that *Mikes* in- volved Medicare-specific considerations and should not be applied to all contexts, or that the express condition rule did not have a basis in the text of the Act. *See* R.70 at 5–7 (citing *United States ex rel. Badr v. Triple Canopy, Inc.*, 775 F.3d 628, 637 n.5 (4th Cir. 2015), *vacated by* —— U.S. ——, 136 S.Ct. 2504, 195 L.Ed.2d 836 (2016) (remanding for reconsideration in light of *Escobar*), *remanded to* 857 F.3d 174 (4th Cir. 2017) (affirming the prior opinion applying the standards of *Esco- bar*); *United States ex rel. Hutcheson v. Black- stone Med., Inc.*, 647 F.3d 377, 388 (1st Cir. 2011); *Sci. Applications Int'l Corp.*, 626 F.3d 1257; *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1177 (9th Cir. 2006)). Although the Government took no position on the viability of the complaint itself, it "re- spectfully urge[d] the Court not to adopt the atextual position that implied certification False Claims Act liability for non-compliance with a contract provision (including regulato- ry or statutory provisions incorporated there- in) necessarily hinges on the presence of an express statement within that provision that payment is conditioned on its compliance." *Id.* at 7.

condition.[16] The district court next inquired whether either the Contractor Code of Ethics or the Truth in Negotiations Act was an express condition of payment and concluded that they were not. The court found "no provision" in any of the relevant contracts "that prohibits payment in the event of noncompliance" with either requirement.[17]

The court then stated that even if the express condition of payment approach embodied in *Mikes* were incorrect, the relators' claim would still fail under the more generous standards of *Science Applications International Corp.*, 626 F.3d at 1269. The district court could find no " 'objective requirements' in the contract that MD 'failed to provide,' or that MD 'continued to bill the Government with the knowledge that it was not providing the contract's requirements.' " [18]

The court noted in a footnote that, although the response to the motion to dismiss had argued a fraud in the inducement theory of liability as well, it was absent from the pleadings. It further determined, without elaboration, that such a claim would "fail for the same reasons" as the implied certification claims and because it failed to meet the particularity standards of Rule 9(b).[19] Finally, the court held that in light of the dismissals of all substantive claims, the conspiracy claim also must fail.

The relators now appeal. They submit that the district court erred in rejecting their fraud in the inducement and implied certification theories of FCA liability. The Government has declined to intervene, but has filed a brief as amicus curiae. Although it takes no position on the sufficiency of the complaint, it contends that contractors who engage in the type of behavior alleged here can be liable under either an implied certification theory or a fraud in the inducement theory. MD, Patriarch, and Ms. Tilton have filed a brief addressing all of the relators' claims. Col. Vergez, named in the conspiracy count, has filed a separate brief focusing primarily on that count.

## II

## DISCUSSION

■ The basic standards that must guide our analysis are well established. "We review *de novo* the district court's grant of a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Timson v. Sampson*, 518 F.3d 870, 872 (11th Cir. 2008) (per curiam). Generally, "[t]o survive a motion to dismiss, a complaint need only present sufficient facts, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1243 (11th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). However, we also have stated clearly that, in a *qui tam* action, the enhanced pleading requirements of Rule 9(b) apply. *See United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1309–10 (11th Cir. 2002). "[U]nder Rule 9(b) allegations of fraud 'must include facts as to time, place, and substance of the defendant's alleged fraud.' " *Id.* at 1308 (quoting *United States ex rel. Cooper v. Blue Cross &*

---

16. R.77 at 10–11 (emphasis in original); *United States ex rel. Keeler v. Eisai, Inc.*, 568 Fed.Appx. 783, 799 (11th Cir. 2014) (unpublished).

17. R.77 at 11; *see also id.* at 17–18.

18. *Id.* at 13 (quoting *Triple Canopy*, 775 F.3d at 638).

19. *Id.* at 7 n.2.

*Blue Shield of Fla., Inc.*, 19 F.3d 562, 567 (11th Cir. 1994) (per curiam)). .

The relators submit that the district court erred in dismissing claims based on an implied certification theory and based on a fraud in the inducement theory. We will address in turn each of these contentions. Before we focus on these particular contentions, however, we will set forth the governing statutory language and examine the Supreme Court's holding in *Escobar*, 136 S.Ct. 1989, which, as we have noted earlier, was decided after the district court rendered its decision in this case.

### A.

The FCA imposes significant financial liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)–(B).

Following the district court's dismissal of relators' first amended complaint, the Supreme Court decided *Escobar*. This decision examines a claim of FCA liability based on the implied certification theory. It is also helpful in assessing the relators' fraud in the inducement theory. In *Escobar*, the relators were the parents of a disabled teenager who died from an adverse reaction to medication provided to treat a diagnosis of bipolar disorder. A mental health facility operated by Universal Health had treated their daughter prior to her death and then had sought reimbursement for her treatment through the Medicaid program. The parents alleged in their complaint that Universal Health submitted its itemized claims to Medicaid by employing standard reimbursement codes. These codes, continued the complaint, "made representations about the specific services provided by specific types of professionals," but "failed to disclose serious violations of regulations pertaining to staff qualifications and licensing requirements for these services." *Id.* at 1998.

The rules of the Massachusetts Medicaid program, which paid the claims, required "satellite facilities to have specific types of clinicians on staff, delineate[d] licensing requirements for particular positions (like psychiatrists, social workers, and nurses), and detail[ed] supervision requirements for other staff." *Id.* Although five separate practitioners treated the relators' daughter, only one of the five had a license. Another who held herself out as a psychologist with a Ph.D. had received her degree from an unaccredited institution, and the state licensing board had rejected her credentials. The prescriber of the medication that prompted the fatal reaction held herself out as a psychiatrist, but "was in fact a nurse who lacked authority to prescribe medication absent supervision." *Id.* at 1997. The relators' complaint alleged that the requests for payment constituted a false claim because inherent in the use of the codes was a certification that the care provided satisfied the requirements for payment set by the Medicaid program.

The Court held "that the implied false certification theory can, at least in some circumstances, provide a basis for liability." *Id.* at 1999. Specifically, "[w]hen, as here, a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided." *Id.* Because the statutory text does not include an independent definition of "false or fraudulent," the Court applied the usual interpretive principle that Congress intended to incorporate settled common law meanings. *Id.* At common law, "fraud has long encompassed certain misrepresentations by omission." *Id.* The Court declined

to "resolve whether all claims for payment implicitly represent that the billing party is legally entitled to payment." *Id.* at 2000. But it held that Universal Health's claims "fall squarely within the rule that half-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations." *Id.* In its view,

the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths.

*Id.* at 2001. In so holding, the Court explicitly noted the *Mikes v. Straus* line of cases, relied upon by the district court in this case, and rejected its approach.

The Court went on to emphasize that, "[u]nder the Act, the misrepresentation must be material to the other party's course of action" and that the Act's scienter requirement means that a plaintiff must show that the defendant had actual knowledge of or recklessly disregarded a condition's materiality. *Id.* The statutory definition of materiality, "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money," *id.* at 2002 (quoting 31 U.S.C. § 3729(b)(4)), focuses the inquiry on "the *effect* on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* (emphasis added). The designation of a statutory, regulatory, or contractual provision as a condition of payment is "relevant, but not automatically dispositive," because the FCA "is not 'an all-purpose antifraud statute'" which "punish[es] garden-variety breaches of contract or regulatory violations." *Id.* at 2003 (quoting *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672, 128 S.Ct. 2123, 170 L.Ed.2d 1030 (2008)). Materiality therefore is not established by showing "that the Government would have the option to decline to pay if it knew of the defendant's noncompliance" or where noncompliance "is minor or insubstantial." *Id.* The materiality standard is "demanding," *id.*, and "rigorous," *id.* at 1996, 2002. The Court concluded,

In sum, when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Id.* at 2003–04.[20]

■ *Escobar* therefore clarified two central and interrelated principles of FCA

---

**20.** To illustrate its point about the limits of materiality, the Court hypothesized a contract for health services that required providers to use American-made staplers. If the Govern-

ment routinely paid claims, irrespective of whether it knew of the use of foreign staplers and even though it had the right to withhold payment, the provision would not be material;

liability. First, the implied certification theory can be a premise of liability at least where a party, in requesting payment, makes certain representations which are misleading because of the omission of violations of statutory, regulatory, or contractual requirements; any such requirement need not be an express condition of payment for liability to attach. Second, such an omission, to be actionable, must be material.

■ We now apply these principles to the complaint before us. The relators allege a series of improprieties in the relationship between Ms. Tilton, MD, and Patriarch, on the one hand, and Col. Vergez, an officer with authority in the NSRWA contracting office on the other. Those improprieties, they contend, amount to potential violations of criminal law involving fraud, conflict of interest, bribery, or gratuity violations. The Contractor Code of Ethics, which is part of the Federal Acquisitions Regulations and is a mandatory term of acquisitions contracts, requires disclosure of any credible evidence of such conduct. The Truth in Negotiations Act sets forth certain disclosure requirements that assist the Government in determining the market value of the products it purchases, which the relators submit, "naturally affect[s] the government's negotiation posture." [21] The relators contend, at some length in their brief, that the Government considers these terms essential and that compliance goes directly to the integrity of the contracting process.

We believe it is appropriate to afford the district court the opportunity to reconsider the allegations in light of the changed legal landscape. *Escobar* makes clear that the district court's principal method for evaluating implied certification claims, under *Mikes*, is no longer appropriate. The Supreme Court explicitly rejected a standard for implied certification claims that focuses exclusively on whether the Government expressly designates a contractual, statutory, or regulatory obligation as a condition of payment. Whether a condition is so designated is "relevant to but not dispositive of the *materiality* inquiry," but not a precondition to the theory of liability itself. *Id.* at 2001 (emphasis added).

*Escobar* now provides the district court with a more refined framework to address the questions before it. The definition of "material" contained within the statute considers whether the misrepresentation had "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property," 31 U.S.C. § 3729(b)(4), a definition "descend[ed] from 'common-law antecedents,'" *Escobar*, 136 S.Ct. at 2002 (quoting *Kungys v. United States*, 485 U.S. 759, 769, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988)). *Escobar* instructs courts to consider whether noncompliance is "minor or insubstantial" and amounts to "garden-variety breaches of contract or regulatory violations," or, conversely, whether the Government would have attached importance to the violation in determining whether to pay the claim. *Id.* at 2002–03 (citing 26 Richard A. Lord, Williston on Contracts § 69:12 (4th ed. 2003); Restatement (Second) of Torts § 538 (Am. Law Inst. 1977)).

We believe that the district court ought to reconsider this case for another reason: given the advent of *Escobar*, the district court may decide that, in fairness to the relators, they should have an opportunity

---

False Claims Act liability would not attach. A contrary rule would be "an extraordinarily expansive view" of fraud liability not justified by the statute. *Universal Health Services, Inc. v. United States ex rel. Escobar*, —— U.S. ——,

136 S.Ct. 1989, 2004, 195 L.Ed.2d 348 (2016).

**21.** Appellants' Amended Br. 42–43.

to replead their allegations in light of the Supreme Court's guidance.[22]

## B.

█ The relators also challenge the district court's conclusion, expressed in a footnote, that the complaint failed to allege fraud in the inducement. The district court did not discern that theory to be in the complaint. If it were in the complaint, continued the court, it failed "for the same reasons" as the implied certification theory, and because the allegations were insufficient under the particularity standards for fraud of Rule 9(b).[23]

Claims alleging fraudulent inducement to support an FCA action derive from *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), *superseded in part on other grounds as noted in Schindler Elevator Corp. v. United States ex rel. Kirk,* 563 U.S. 401, 412, 131 S.Ct. 1885, 179 L.Ed.2d 825 (2011). *Marcus* involved a request for competitive bids for Public Works Administration projects. Electrical contractors colluded to ensure that there would be no price competition. The Court found that the collusion was a "fraud" that satisfied the Act and that the "fraud did not spend itself with

the execution of the contract." *Id.* at 543, 63 S.Ct. 379. That is, the original fraud that influenced the Government's decision to enter into a particular contract at a particular price "pressed ever to the ultimate goal—payment of government money to persons who had caused it to be defrauded." *Id.* at 543–44, 63 S.Ct. 379. The contractor's ultimate claims for payment were "grounded in fraud" when the Government paid them, even though the "fraud" occurred prior to the execution of the contract itself. *Id.* at 544, 63 S.Ct. 379. As one of our sister circuits has recognized, subsequent claims are false "because of an *original fraud* (whether a certification or otherwise)." *United States ex rel. Hendow v. Univ. of Phoenix,* 461 F.3d 1166, 1173 (9th Cir. 2006) (emphasis in original).[24]

We agree with Government as amicus curiae that the allegations of the relators' complaint could support multiple theories of fraud in the inducement. First, the allegations can be read to support the view that the prospective promise to comply with various provisions of law, including the Contractor Code of Ethics and the Truth in Negotiations Act, were false when made. The Government would not have

---

**22.** Our resolution of the substantive claims equally affects the allegations concerning the conspiracy count.

**23.** R.77 at 7 n.2. Although the label of fraudulent inducement does not appear on the face of the complaint, neither does the label of implied certification. Nor does a plaintiff's labeling of their complaint bind us. *See Johnson v. City of Shelby,* — U.S. —, 135 S.Ct. 346, 346, 190 L.Ed.2d 309 (2014) (per curiam) (noting that federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted").

**24.** Other circuits have conceptualized such claims somewhat differently under this statute, although still acknowledging their validity:

The False Claims Act covers anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government[.'"] 31 U.S.C. § 3729(a)(2). The [defendant] "uses" its [initial fraudulent statement] when it makes ... [an] application for payment. No more is required under the statute. ... The statute requires a causal rather than a temporal connection between fraud and payment. If a false statement is integral to a causal chain leading to payment, it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork.

*United States ex rel. Main v. Oakland City Univ.,* 426 F.3d 914, 916 (7th Cir. 2005) (citation omitted).

entered into those had it known of the defendants' unwillingness to comply with these rules. The allegations also support the view that, on at least some occasions, MD provided incomplete pricing data to the Government. This incomplete data induced the Government to enter contracts on terms more favorable to MD than it would have had the pricing data been complete. Indeed, the complaint is explicit on this point. With respect to several of the contracts, the relators allege that the Army requested pricing data, that MD provided misleadingly incomplete data to support an inflated price, and that the Government relied on the data in awarding the contract.[25] The Government also asserts that the undisclosed conflicts of interest while MD and Col. Vergez were negotiating their future relationship might have caused the Army to accept an inflated contract price. MD's response to these allegations, that the Government is not necessarily entitled to the best price commercially available, is unavailing. Here, the concern is whether the pricing data was misleadingly incomplete such that it amounted to fraud, and whether that data was material to the Government's decisions on the contracts. As *Escobar* reminds us, "fraud" at common law has long included "misrepresentations by omission" such as the above. 136 S.Ct. at 1999.

The district court also concluded that, even if the complaint did include a fraudulent inducement theory, such a claim would fail for the "same reasons" as the implied certification claims. We have concluded that, in light of *Escobar*, the district court should evaluate anew the implied certification claims, both with respect to the fraudulent statements and with respect to materiality. More fundamentally, it is far from self-evident that the court's assessment of the implied certification theory should control its disposition of the fraudulent inducement theory. Each theory of liability rests on different factual allegations. Finally, we are not convinced that the court's brief mention of a failure under Rule 9(b)'s specificity requirement accurately assesses the relators' detailed forty-five-page complaint.

### Conclusion

The district court decided the motion to dismiss in a profoundly uncertain legal environment. The Supreme Court now has provided significant guidance. The correct course is to allow the district court to consider this matter in light of that guidance. On remand, the district court also should consider whether to allow the plaintiffs to file a second amended complaint that conforms its allegations to the requirements of *Escobar*. We also conclude that the complaint did plead fraud in the inducement, and we therefore remand so that the district court can reexamine the allegations relating to that theory.

VACATED and REMANDED.

---

25. *See, e.g.,* R.57 at 18–19, ¶ 33; 35, ¶ 91 (relating to the El Salvador contract).