[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10600

_____

DENNIE GOSE,

Plaintiff,

BRENT BERRY,
SEAN GOSE,
as Personal Representative of the Estate of
Deceased Relator Dennie Gose,

Plaintiffs-Appellants,

*versus*

NATIVE AMERICAN SERVICES CORPORATION,
GREAT AMERICAN INSURANCE GROUP, INC.,
d.b.a. Great American Insurance Company,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:16-cv-03411-SCB-AEP

_____

Before JORDAN, LAGOA, and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

The federal government awards billions of dollars in contracts annually.[1]  Sometimes, the Government may award contracts to specific types of small businesses via set-aside programs. *See* 15 U.S.C. § 637; 48 C.F.R. § 19.501.  One such program is the Minority Small Business and Capital Ownership Development Program—more commonly known as the 8(a) program.  Under the 8(a) program, contractors are subject to various requirements. One of those requirements is the obligation to notify the Small Business Administration (SBA) when contractors no longer satisfy the requisite ownership or control thresholds for inclusion in the program.  13 C.F.R. § 124.515(g).

---

[1] *See A Snapshot of Government-wide Contracting for FY 2021*, U.S. Gov't Accountability Off. (Aug. 25, 2022), https://perma.cc/VFR4-HJZE ("In Fiscal Year 2021, the federal government spent $637 billion on contracts . . . ." (emphasis omitted)); *Contractual Services and Supplies*, USASpending, (Mar. 30, 2024), https://perma.cc/5PQN-SEY6 (reporting $462.7 billion obligated on government contracts as of March 30, 2024).

In this appeal, we face several questions related to the 8(a) program but two are most important. First, whether a business that has graduated from the 8(a) program but is still bidding and performing work on 8(a) contracts is an 8(a) "participant" and therefore subject to the program's ownership and control requirements. And second, whether submitting bids and claims for payment under those circumstances without notifying the SBA presents an actionable claim under the False Claims Act (FCA).

DWG & Associates, Inc.—an architecture and construction firm owned by Relators Dennie Gose and Brent Berry—was awarded several 8(a) contracts.[2] Years later, DWG grew too large and graduated from the 8(a) program, although SBA regulations allowed it to continue fulfilling orders on 8(a) contracts it had already been awarded. When DWG ran into financial troubles, Great American Insurance Company (GAIC)—the company that had issued surety bonds on DWG's projects—and Native American Services Corporation (NASCO)—the company DWG partnered with to help complete its contracts—allegedly took control and majority ownership of DWG. Rather than notify the SBA to seek a waiver as required by the regulations, DWG (now under GAIC and NASCO's control) kept bidding on jobs and submitting claims under the contracts.

---

[2] Although Sean Gose is listed in the case caption because he is the personal representative of Dennie Gose who passed away in November 2018 after the suit was filed, our "Gose" references mean Dennie Gose.

Relators filed a qui tam suit under the FCA, alleging that by doing so GAIC and NASCO used DWG to present false claims. The District Court granted GAIC's and NASCO's motions to dismiss. It found, among other things, that because DWG graduated from the program, it was no longer an 8(a) participant and thus the control and ownership regulations no longer applied to DWG. Relators therefore failed to plead that any false claim was made.

After careful review, and with the benefit of oral argument, we reverse. A business still bidding or performing work on 8(a) contracts remains a participant and is still subject to the program's requirements. And, in some cases, when such a business submits bids without obtaining a waiver from the SBA and later submits claims for payment, that business has presented a false claim under the FCA.

Our opinion proceeds in four parts. In Part I, we recount the factual and procedural history that brought the case to us. In Part II, we lay out the applicable legal standards. Part III analyzes the issues before us, paying special attention to the intricacies of the 8(a) program, defining the meaning of "participant," and explaining how a fraudulent inducement theory raises a cognizable false claim under the FCA. Part IV briefly concludes with instructions for the District Court on remand.

## I. Background

We begin by describing DWG's foray into the 8(a) program, how DWG became involved with GAIC and NASCO, and the District Court proceedings.

### A. *DWG is Formed and Admitted to the 8(a) Program*

After completing his military service and obtaining an architectural license, Gose founded and incorporated DWG in 1995. DWG later acquired CDR Enterprises, which brought Berry to the company. Gose was DWG's CEO and a 51% shareholder while Berry was DWG's CFO and a 49% shareholder.

In March 2004, DWG was admitted into the 8(a) program based on Gose's disadvantaged status.[3] DWG then successfully bid on and was awarded several 8(a) set-aside Indefinite Delivery Indefinite Quantity (IDIQ) contracts (both single and multiple awards) for construction and building design.[4] While DWG held these contracts, it competed among a pool of 8(a) contractors for task orders—i.e., "orders for the performance of tasks during the

_____

[3] We define what disadvantaged means under the 8(a) program below. *See infra* note 10.

[4] An IDIQ "contract provides for an indefinite quantity, within stated limits, of supplies or services during a fixed period. The Government places orders"—known as delivery orders for supplies or task orders for services—"for individual requirements." 48 C.F.R. § 16.504(a); *see also id.* § 2.101 ("Task order means an order for services placed against an established contract or with Government sources.").

"An agency usually awards within an IDIQ contract a pre-set base period of performance, with elective option years that the government may exercise if it chooses to extend the duration of the contract." Dominick A. Fiorentino & Alexandra G. Neenan, Cong. Rsch. Serv., IF I 2558, *Indefinite Delivery, Indefinite Quantity Contracts* 1 (2023). And IDIQs—which come in a variety of sub-types—may be awarded to a single contractor or to multiple contractors, who then compete over individual delivery or task orders. *See* 48 C.F.R. § 16.504(c) (noting a general preference for multiple award contracts).

6                    Opinion of the Court                    23-10600

period of the contract"—on the multiple award contracts.
48 C.F.R. § 16.501-1.

As with most federal construction contracts, DWG was required to obtain surety bonds to protect the Government's interests for DWG's nonperformance.[5] To comply with this requirement, DWG obtained surety bonds for its task orders from GAIC. In exchange for the bonds, Gose, Berry, and their spouses entered into an indemnity agreement with GAIC in which they put up their personal assets as collateral.

By early 2010, DWG had been so successful that it outgrew the 8(a) program's size limits and therefore graduated. That meant that DWG could no longer compete for new 8(a) contracts. But because Gose still controlled and owned a majority share of DWG, as required by the regulations, DWG was eligible to bid on task orders under previously awarded 8(a) contracts.

### B. GAIC and NASCO's Alleged Takeover of DWG

DWG's success was short-lived. By June 2012, its financial situation deteriorated, and it was in danger of defaulting on its existing contracts. If DWG defaulted, GAIC would have been liable for more than tens of millions of dollars in uncompleted projects.

---

[5] *See* 40 U.S.C. § 3131(b) ("Before any contract of more than $100,000 is awarded for the construction, alteration, or repair of any public building or public work of the Federal Government, a person must furnish to the Government [performance and payment] bonds . . . ."); 48 C.F.R. § 28.102-1(a) ("[T]he Miller Act[] requires performance and payment bonds for any construction contract exceeding $150,000 . . . .").

And—under the indemnity agreement—Gose, Berry, and their spouses were at risk of losing the assets they had pledged as collateral. When DWG notified GAIC about its financial condition, "GAIC froze DWG's bonding program and refused to issue further bonds without third-party indemnification." And without a surety, DWG could no longer bid on task orders.

To thaw GAIC's bonding restriction, DWG needed help. So Berry began negotiating with construction companies to assist DWG with its backlog of government contract work and to potentially partner on or acquire DWG's future work within the 8(a) program's limits. NASCO was one of those companies. Yet, by August 2012, GAIC instructed DWG to stop negotiations with any other potential partners besides NASCO.

That's when "GAIC and NASCO forced Gose out of the picture." According to Relators, GAIC and NASCO conspired to use their financial leverage over Gose to strong arm him into several agreements, one of which was on behalf of DWG. One of those agreements—a "Right of First Refusal and Option Agreement"—gave NASCO a right of first refusal to buy all of Gose's shares of DWG and restricted Gose from selling less than all his shares. The second agreement—the Final Management and Advisory Services (MAS) Agreement—assigned 100% of all contract proceeds to GAIC and NASCO.[6]

---

[6] Under the Final MAS Agreement, NASCO would receive 98% of all contract proceeds and GAIC would receive the remaining 2%.

As a result, Gose alleged that he lost both control and 51% unconditional ownership of DWG.  At some point, DWG's attorney warned GAIC and NASCO that these agreements "potentially violated SBA regulations" because DWG's 8(a) eligibility status hinged on Gose's control and ownership.  NASCO acknowledged this warning but pressed ahead with finalizing the agreements.

With the agreements finalized, GAIC and NASCO took control of DWG.  Among other things, Relators alleged that: (1) NASCO directed Berry to notify Government contracting officers, on behalf of DWG, that NASCO was now a "critical subcontractor"; (2) NASCO laid off DWG personnel and replaced them with NASCO employees; (3) GAIC suspended part of DWG's tuition reimbursement program; (4) NASCO ordered and changed DWG's cell phone policies; (5) NASCO terminated Berry's employment; (6) NASCO reduced Gose's CEO salary to an amount lower than other employees; (7) NASCO took control of DWG's document and record keeping; and (8) GAIC and NASCO decided which future task orders to bid on.

But neither GAIC nor NASCO notified the SBA of the agreements or change in ownership and control, despite NASCO knowing—as a former 8(a) contractor—that such an ownership or control change required permission from the SBA.[7]  Meanwhile, GAIC

---

[7] NASCO graduated from the 8(a) program in 2008.  With the SBA's approval, arrangements between graduated 8(a) contractors and current 8(a) contractors are allowed under the 8(a) Mentor-Protégé program.  *See* 13 C.F.R. § 125.9.  That program helps eligible small businesses (protégés) gain capacity and win

and NASCO used DWG to bid on task orders and submit payment claims to the Government. The Government, unaware of the agreements, awarded DWG dozens of other task orders and paid DWG tens of millions of dollars—all of which went to GAIC and NASCO.

### C. District Court Proceedings

Relators then filed a qui tam complaint under the FCA to recover the payments. Their complaint pled six counts:

- Counts I–II (the false presentment claims) alleged that GAIC and NASCO violated 31 U.S.C. § 3729(a)(1)(A) by knowingly making or presenting, or causing to be made or presented, bids for task orders by DWG that they knew DWG was not eligible to receive because of its change of ownership and control;

- Counts III–IV (the false statement claims) alleged that GAIC and NASCO violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used false records or statements material to getting false claims paid; and

- Counts V–VI (the conspiracy claims) alleged that GAIC and NASCO violated 31 U.S.C. § 3729(a)(1)(C ) by conspiring to

---

government contracts through partnerships with more experienced companies (mentors). *Id.* § 125.9(a). But the SBA will not approve such a relationship if the mentor, among other things, "controls the managers of the protégé[]" or acquires "an equity interest [over] 40% in the protégé firm." *Id.* § 12.59(b)(2), (d)(2).

submit and submitting bids through DWG, which they knew DWG was not eligible for.

GAIC and NASCO moved to dismiss the complaint. The District Court granted GAIC's and NASCO's motions and dismissed Realtors' claims with prejudice.

As for Counts I–II, the District Court found that Relators failed to state a false presentment claim, mainly because Relators failed to adequately allege the existence of a false claim. The District Court reasoned that GAIC and NASCO were not required to seek a waiver because DWG had graduated from the 8(a) program when the agreements between GAIC, NASCO, and DWG were finalized. DWG therefore was no longer a "participant" and not subject to the regulation's loss-of-control or mandatory termination requirements. The District Court continued that, even if DWG were subject to these requirements, the agreements between GAIC, NASCO, and DWG did not divest Gose of 51% unconditional ownership. But the court did not otherwise address whether Gose had lost control of DWG.

After noting that Relators' complaint rested on a fraudulent inducement theory, the District Court reasoned that "[f]raudulent inducement with regard to bidding on a government contract, as distinguished from submitting a claim for payment under the contract, is not available as a cause of action under the FCA." *United States v. Native Am. Servs. Corp.*, No. 8:16-cv-3411-SCB-AEP, 2022 WL 18932981, at \*7 (M.D. Fla. Nov. 14, 2022). Alternatively,

23-10600                Opinion of the Court                11

the court found that Relators failed to satisfy Rule 9(b)'s particularity requirement because they did not provide "information regarding (1) the bids that were supposedly fraudulent, and (2) the claims for payment supposedly at issue." *Id.*[8] Because Relators could show neither a fraudulent claim nor one that was presented, "they consequently [could not] prove . . . that the claim was presented with knowledge of its falsity." *Id.* at *8.

As to Counts III–IV, the District Court largely denied Relators' false statement claims for the same reasons. Namely, the court reasoned that Gose and Berry's complaint did not plausibly, or particularly, state a claim.

Finally, the District Court turned to Relators' conspiracy claims in Counts V–VI. Like Counts III–IV, the court dismissed the conspiracy claims because there was no plausible false claim and because Relators failed to satisfy Rule 9(b).

Relators moved for reconsideration. And the Government filed a Statement of Interest. The Government stated that the District Court erred by: (1) concluding that the change in ownership and control provisions under the 8(a) program lapse when a company graduates, and (2) finding that fraudulent inducement is not cognizable under the False Claims Act. The District Court, unpersuaded by Relators or the Government, denied the motion because

---

[8] As noted below, Federal Rule of Civil Procedure 9(b) requires that when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *See infra* Part II & Section III.B.1.iv.

Relators had not presented it with any clear error. And it held firm to its decision that because DWG had graduated it was no longer an 8(a) participant. Relators timely appealed.

## II.  Legal Standards

"We review *de novo* the district court's grant of a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Timson v. Sampson*, 518 F.3d 870, 872 (11th Cir. 2008) (per curiam). "Generally, '[t]o survive a motion to dismiss, a complaint need only present sufficient facts, accepted as true, to state a claim to relief that is plausible on its face.'" *Marsteller ex rel. United States v. Tilton*, 880 F.3d 1302, 1310 (11th Cir. 2018) (alteration in original) (quotation marks omitted) (quoting *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1243 (11th Cir. 2016)); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"However, we also have stated clearly that, in a *qui tam* action, the enhanced pleading requirements of Rule 9(b) apply." *Marsteller*, 880 F.3d at 1310. "A False Claims Act complaint satisfies Rule 9(b) if it sets forth '"facts as to time, place, and substance of the defendant's alleged fraud," specifically "the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them."'" *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009) (quoting *United States ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1310 (11th Cir. 2002)).

### III.  Discussion

Relators argue that the District Court erred in two main ways.  First, they contend their complaint plausibly and particularly established both their false presentment and false statement claims under 31 U.S.C. § 3729(a)(1)(A)–(B).  Second, Relators assert that their complaint sufficiently pled the existence of an FCA conspiracy under 31 U.S.C. § 3729(a)(1)(C) between GAIC and NASCO.  We agree and explain why in two parts.  First, we detail how the 8(a) program works.  Second, we describe why Relators' claims were both plausible and satisfied Rule 9(b).

### A.  The 8(a) Program

As noted above, the 8(a) program is one of many congressionally developed programs aimed at helping small businesses win federal government contracts.  *See* 15 U.S.C. §§ 636(j)(10), 637(a).  It does so by giving those businesses preferential treatment when bidding on certain contracts.  *Id*. § 637(a); 13 C.F.R. § 124.1.

The SBA administers the 8(a) program and has promulgated implementing regulations.  *See* 13 C.F.R. pt. 124.  To be admitted to the 8(a) program, the SBA must certify that a business is both "small" and "disadvantaged."  *See* 15 U.S.C. § 636(j)(11)(E)–(F); 13 C.F.R. § 124.101.  A business is "small" if it meets the size standards in 13 C.F.R. Part 121.[9]  *See* 13 C.F.R. § 124.102.  And a business

---

[9] The SBA maintains a table of small business size standards in 13 C.F.R. § 121.201.  Whether a business is small turns on the applicable North American Industry Classification System (NAICS) code and a business's total annual income or number of employees.  *See id*.  NAICS is the standard used

14                        Opinion of the Court                        23-10600

is "disadvantaged" if at least 51% of the business is unconditionally owned and controlled by one or more individuals who are both socially and economically disadvantaged.[10]  15 U.S.C. § 637(a)(4)(A)–(B); 13 C.F.R. §§ 124.105 to .106.

Once "admitted to . . . the 8(a) BD program" a small business concern becomes a "participant." 13 C.F.R. § 124.3. Participants can then bid on federal contracts that are awarded outside Federal Acquisition Regulation (FAR) Subpart 6.1's standard "full and open competition" process, like the IDIQ contracts here.[11] 48 C.F.R. § 6.100; 13 C.F.R. § 124.501(a). Certification under the

---

by federal statistical agencies to classify businesses in "collecting, analyzing, and publishing statistical data related to the U.S. business economy." *North American Industry Classification System*, U.S. Census Bureau, https://perma.cc/LLJ9-E6X7 (last visited May 13, 2024). "The procuring agency contracting officer, or authorized representative, designates the proper NAICS code and corresponding size standard in a solicitation . . . which best describes the principal purpose of the product or service being acquired." 13 C.F.R. § 121.402(b).

[10] "Socially disadvantaged" persons are those "subjected to racial or ethnic prejudice or cultural bias within American society because of their identities as members of groups without regard to their individual qualities. The social disadvantage must stem from circumstances beyond their control." 13 C.F.R. § 124.103(a); 15 U.S.C. § 637(a)(5). "Economically disadvantaged" persons are those "whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same or similar line of business who are not socially disadvantaged." 13 C.F.R. § 124.104(a); 15 U.S.C. § 637(a)(6)(A).

[11] *See supra* note 4.

23-10600                Opinion of the Court                15

8(a) program typically lasts for nine years, at which time a participant automatically exits or "graduates."   13 C.F.R. §§ 124.2(a), 124.302(a).

But the nine-year term can be shortened by voluntary withdrawal, "early graduation (including voluntary early graduation)," or termination.  13 C.F.R. § 124.2(a).  Early graduation, like what DWG experienced in 2010, can occur when a participant "exceeds the size standard corresponding to its primary NAICS code . . . for three successive program years."  *Id.* § 124.302(b).[12]  Graduates become ineligible to bid on new 8(a) contracts but remain "obligated to complete previously awarded 8(a) contracts, including any priced options which may be exercised."  *Id.* § 124.304(f)(1)–(2). And with respect to IDIQ contracts, "[a] concern awarded a[n IDIQ] contract . . . that was set-aside exclusively for 8(a) Program Participants may generally continue to receive new [task] orders

---

[12] A participant can also graduate early if the SBA determines that:

(1)  The concern has successfully completed the 8(a) BD program by substantially achieving the targets, objectives, and goals set forth in its business plan, and has demonstrated the ability to compete in the marketplace without assistance under the 8(a) BD program; or

(2)  One or more of the disadvantaged owners upon whom the Participant's eligibility is based are no longer economically disadvantaged.

13 C.F.R. § 124.302(a).  And the "SBA may graduate a Participant prior to the expiration of its program term where excessive funds or other assets have been withdrawn from the Participant, causing SBA to determine that the Participant has demonstrated the ability to compete in the marketplace without assistance under the 8(a) BD program."  *Id.* § 124.302(c) (citing 13 C.F.R. § 124.112(d)(3)).

even if it has grown to be other than small or has exited the 8(a) BD program." *Id.* § 124.503(i)(1)(iii); *see also* 48 C.F.R. § 19.804-6(d) ("An 8(a) contractor may continue to accept new orders under [an IDIQ] contract, even if it exits the 8(a) program, or becomes other than small for the NAICS code(s) assigned to the contract.").[13]

---

[13] Despite a participant's ability and obligation to continue performing, agency contracting officers have discretion "to award an order only to a concern that is a current Participant in the 8(a) program at the time of the order." 13 C.F.R. § 124.503(i)(1)(iii). "In such a case, the procuring agency will announce its intent to limit the award of the order to current 8(a) Participants and verify a contract holder's 8(a) BD status prior to issuing the order." *Id.*; *see also id.* § 124.521(e)(1). And, if an 8(a) contract contains options to extend the initial ordering period past a contract's base period, a contracting officer's discretion to exercise those options to award more task orders depends, in part, on whether the participant has graduated or been terminated from the 8(a) program. *See id.* § 124.514(a)–(b). For 8(a) contracts "with durations of more than five years (including options), a contracting officer must verify in SAM.gov . . . whether a business concern continues to be an eligible 8(a) Participant no more than 120 days prior to the end of the fifth year of the contract." *Id.* § 124.521(e)(2). "Where a concern fails to qualify or will no longer qualify as an eligible 8(a) Participant at any point during the 120 days prior to the end of the fifth year of the contract, the option *shall not be exercised*." *Id.* (emphasis added).

We take judicial notice that at least one of the contracts listed in Relators' complaint was solicited with a period of performance of one base year and four option years. *See SABER - US Air Force Academy*, SAM (May 5, 2009, 12:20 PM), https://perma.cc/2CN3-VJJF (stating this information in the presolicitation to contract FA7000-09-D-0020). *See* Fed. R. Evid. 201(b); *Terrebonne v. Blackburn*, 646 F.2d 997, 1000 n.4 (5th Cir. June 1981) (en banc) ("Absent some reason for mistrust, courts have not hesitated to take judicial notice of agency records and reports."). And Relators' complaint alleges that one contract—HSCG82-10-D-PMVA53—had a period of performance exceeding five years.

23-10600              Opinion of the Court                   17

The SBA may also "terminate the participation of a concern in the 8(a) BD program prior to the expiration of the concern's Program Term for good cause." 13 C.F.R. § 124.303(a). The regulations provide several examples of good cause, but relevant here is § 124.303(a)(4). Section 124.303(a)(4) permits termination if the 8(a) contractor fails to "obtain prior written approval from SBA for any changes in ownership or business structure, management[,] or control pursuant to §§ 124.105 and 124.106." *See also* 15 U.S.C. § 637(a)(21)(A) ("[I]f the owner or owners upon whom eligibility was based relinquish ownership or control of such a concern, or enter into any agreement to relinquish such ownership or control, such contract or option shall be terminated for the convenience of the Government . . . .").

And for good reason. The Small Business Act and its implementing regulations direct contracts awarded under set-aside programs to "be performed by the concern that initially received such contract[s]." 15 U.S.C. § 637(a)(21)(A). That said, the SBA may waive the ownership or control requirements if "[t]he 8(a) contractor . . . request[s] a waiver in writing prior to the change in ownership and control," 13 C.F.R. § 124.515(c), that demonstrates particular condition(s) exist. *See id.* § 124.515(b); 15 U.S.C. § 637(a)(21)(B). One significant condition is when:

> (5) It is necessary for the disadvantaged owners of the itial 8(a) awardee to relinquish ownership of a majority of the voting stock of the concern in order to raise equity capital, but only if—

(i) *The concern has graduated* from the 8(a) BD program;

(ii) *The disadvantaged owners will maintain ownership* of the largest single outstanding block of voting stock (including stock held by affiliated parties); and

(iii) *The disadvantaged owners will maintain control* of the daily business operations of the concern.

13 C.F.R. § 124.515(b)(5) (emphasis added); 15 U.S.C. § 637(a)(21)(B)(v).

### B. *Plausibility and Particularity*

Now that we have laid out the 8(a) program's foundation, we can explain why Relators' claims were both plausibly and particularly pled. We start with Relators' false presentment and false statement claims. And then we address Relators' conspiracy claims.

### 1. False Presentment and False Statement Claims

"The FCA imposes liability on any person who 'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.'" *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017) (alteration in original) (quoting 31 U.S.C. § 3729(a)(1)(A)–(B)). Both provisions share the

same elements: "the existence of a false claim or statement, the materiality of that false claim or statement, and scienter." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1298 (11th Cir. 2021).[14] Though the District Court referenced materiality and scienter, its focus was on the existence of a false claim or statement. So we concentrate our discussion there.

i. Control and the Meaning of "Participant"

The District Court's ruling that Relators' complaint failed to allege any falsity hinged on its finding that DWG was not an 8(a) participant. The court reasoned that DWG had graduated from the 8(a) program, and therefore "the control requirements of [13 C.F.R.] § 124.106(a)(1) did not apply to DWG" at the time of its alleged takeover in 2012. *Native Am. Servs. Corp.*, 2022 WL 18932981, at *5. Relators contend that the plain language of § 124.515(a)(1) and § 15 U.S.C. 637(a)(21)(A), their context, structure, and regulatory and legislative histories, point to the opposite conclusion: "participant" necessarily includes both graduated and nongraduated businesses. GAIC and NASCO would have us adopt the District Court's reading of "participant" along the same reasoning. That we cannot do. We agree with Relators that

---

[14] The key difference between a false presentment claim and a false statement claim is that false statement claims do "not demand proof that the defendant presented or caused to be presented a false claim to the government or that the defendant's false record or statement itself was ever submitted to the government." *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1327 (11th Cir. 2009) (interpreting the pre-2009 amendment version of the statute).

such a reading is incompatible with the plain meaning of both 13 C.F.R. § 124.515 and 15 U.S.C. § 637(a)(21)(A).

When interpreting "the meaning of a statute or regulation, 'the first step is to determine whether the statutory language has a plain and unambiguous meaning by referring to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *SEC v. Levin*, 849 F.3d 995, 1003 (11th Cir. 2017) (quoting *Bautista v. Star Cruises*, 396 F.3d 1289, 1295 (11th Cir. 2005)). "If the statute's [or regulation's] meaning is plain and unambiguous, there is no need for further inquiry." *Id.* (quoting *CBS Broad. Inc. v. Echostar Commc'ns Corp.*, 532 F.3d 1294, 1300–01 (11th Cir. 2008)). "To determine the plain meaning of a statute or regulation, we do not look at one word or term in isolation, but rather look to the entire statutory or regulatory context." *Id.*

Under 13 C.F.R. § 124.3, "[p]articipant means a small business concern admitted to participate in the 8(a) BD program." That definition has two components: (1) "small business concern" and (2) "admitted." As explained above, "smallness" hinges on the applicable NAICS code and the "number of employees or annual receipts" of a business. *See* 13 C.F.R. § 121.201. And the regulations define "concern" as a "business entity organized for profit, with a place of business located in the United States, and which operates primarily within the United States or which makes a significant contribution to the U.S. economy through payment of taxes or use of American products, materials or labor." *Id.* § 121.105. Simple enough.

23-10600                 Opinion of the Court                 21

That leaves us with "admitted."  The regulations do not define the term, but dictionaries provide some help.  Webster's defines "admitted" as "to allow entry (as to a place, fellowship, or privilege)."  *Admitted*, *Merriam-Webster's Third New International Dictionary* (3d ed. 1993).  Similarly, the Oxford English Dictionary defines that term as "[t]o accept (a person) into any office, status, or privilege."  *Admit*, *Oxford English Dictionary* (2011).  Of course, those definitions get us only so far as they "lack[] any temporal qualifier and [are] consistent with either current or past" admittance.  *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 342 (1997).  But no matter, the regulatory context, structure, and purpose provide a clear answer.  *See id.* at 342–43 (looking to context to determine whether "employee" under Title VII meant current or past employee).

And we need not look far to get that answer.  For example, 13 C.F.R. § 124.515(a) requires that "[a]n 8(a) contract . . . must be performed by the Participant that initially received it."  *See also* 15 U.S.C. § 637(a)(21)(A).  That requirement must be read in harmony with the other requirement that "[a]fter the effective date of early graduation or termination, a Participant . . . . is obligated to complete previously awarded 8(a) contracts."  13 C.F.R. § 124.304(f)(1); *see In re Shek*, 947 F.3d 770, 777 (11th Cir. 2020) ("We must interpret statutes 'harmoniously,' reconciling separate sections so that they are compatible and not contradictory." (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 180 (2012))); *United States v. Marte*, 356 F.3d 1336, 1341

(11th Cir. 2004) ("When a regulation implements a statute, the regulation must be construed in light of the statute . . . ." (citations omitted)). Read together, "participant" must include 8(a) graduates that continue to perform on contracts exclusively set-aside under the 8(a) program.[15]

Still not convinced? Hold still; the regulatory structure also points toward that conclusion. As we just mentioned, the regulations require 8(a) contracts to be performed by the participant that originally received it, absent a waiver. 13 C.F.R. § 124.515(a). The next subsection lists the five bases under which the SBA may waive this requirement, "if requested to do so by the 8(a) contractor." *Id.* § 124.515(b). In that context, "participant" must include "8(a) contractors" that have graduated yet are still performing an 8(a) contract. It would be odd, if not absurd, for the set of entities eligible to receive waivers to be broader than the set of entities subject to regulatory requirement in the first place. *See Lewis v. Barnhart,* 285 F.3d 1329, 1332 (11th Cir. 2002) (per curiam) (noting that courts will interpret statutes to avoid "absurdity of results" (quoting *United States v. Weaver,* 275 F.3d 1320, 1331 (11th Cir. 2001))).

And that's not all. The waiver's substantive requirements bolster this interpretation. One of the five waiver bases permits a

---

[15] As the Government's amicus brief points out, not every use of "participant" includes 8(a) graduates. Context is critical. *See Env't Def. v. Duke Energy Corp.,* 549 U.S. 561, 574 (2007). Sometimes "participant" refers only to nongraduated contractors. *See, e.g.,* 13 C.F.R. § 124.301(a) ("A Participant may voluntarily withdraw from the 8(a) BD program at any time prior to the expiration of its program term.").

23-10600                Opinion of the Court                23

business to "relinquish ownership of a majority of the voting stock of the concern in order to raise capital, but only if [t]he concern has graduated from the 8(a) BD program." *Id.* § 124.515(b)(5)(i); *see also* 15 U.S.C. § 637(a)(21)(B)(v)(I). If graduates are not subject to the initial requirement in § 124.515(a), why would a graduate ever need such a waiver? They wouldn't. So such an interpretation would render that waiver provision irrelevant. But it is well-established that "courts should avoid rendering other provisions of a regulation superfluous or inoperative." *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1245 (11th Cir. 2008).

We also have a duty to read the SBA regulations in harmony with other regulations. *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 525 (2018). That includes the FAR: the regulation that governs most federal acquisitions. *See* 48 C.F.R. § 1.104. Like the SBA regulatory provisions, one provision in the FAR requires 8(a) contracts to be "terminated for convenience if the 8(a) contractor to which it was awarded transfers ownership or control of the firm . . . unless the Administrator of the SBA waives the requirement for contract termination." *Id.* § 19.812(e). Nothing in that FAR provision distinguishes 8(a) graduates from other participants, and we should not read the SBA regulation in a way that creates unnecessary conflict.

And we would be remiss not to consider "the stated purpose of the [SBA's] regulation." *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1362 (11th Cir. 2018). The application of the change

in ownership and control regulations to 8(a) graduates is most consistent with the 8(a) program's purpose: "to assist eligible small disadvantaged business concerns compete in the American economy through business development." 13 C.F.R. § 124.1; *see also* 15 U.S.C. § 631(f) (listing Congressional findings related to this purpose). Can you imagine if 8(a) graduates—still bidding and performing on task orders under 8(a) contracts—were exempt from the requirement to report and seek approval for changes in ownership and control? That would seriously impair a core limitation on the businesses that can perform those contracts. Put differently, adopting GAIC and NASCO's interpretation would permit ineligible businesses to obtain 8(a) program benefits by assuming ownership of, or control over, 8(a) graduates with ongoing 8(a) contracts.[16] "We do not see how Congress [or the SBA] could have

---

[16] One more thing just for good measure—"the regulatory history lends support for [our] interpretation." *SEC v. Levin*, 849 F.3d 995, 1004 (11th Cir. 2017); s*ee also LSSi Data Corp. v. Comcast Phone, LLC*, 696 F.3d 1114, 1117 n.4 (11th Cir. 2012) ("A review of the industry's 'regulatory history helps to illuminate the proper interpretation and application' of the Act." (quoting *Glob. Crossing Telecomm., Inc. v. Metrophones Telecomm., Inc.*, 550 U.S. 45, 48 (2007))). The Committee on Small Business recognized that 8(a) contractors may need to sell equity interests in their businesses to attract additional capital, but it also noted "a need to ensure that contract opportunities provided to develop small minority businesses not be transferred to non-disadvantaged firms outside the program." Committee on Small Business, 100th Cong., Summary of Major Provisions of Public Law 100-656 "The Business Opportunity Development Reform Act of 1988" 5 (Comm. Print. 1988). Which is why "with some exceptions, contracts transferred by 8(a) companies will be terminated for the convenience of the government." *Id.*

intended to create such a large and obvious loophole in one of the key regulatory innovations of the [8(a) program]." *County of Maui v. Haw. Wildlife Fund*, 590 U.S. 165, 178–79 (2020).[17]

All these considerations compel one conclusion: in this context, "participant" includes both nongraduated and graduated concerns. The 8(a) program rules on control and unconditional ownership therefore still applied to DWG while it performed on its existing 8(a) contracts.

### ii. Ownership

That leads us to the District Court's alternative ruling that, even if the control and ownership requirements applied, Relators failed to plausibly allege that Gose lost unconditional ownership of DWG. Relators argue that the District Court's alternative ruling is

---

[17] Nor are we convinced that the three decisions of SBA's Office of Hearing and Appeals cited by GAIC and NASCO support a different interpretation. None of these decisions deal with whether a graduated 8(a) contractor *with ongoing contracts* is still a participant. Instead, two of the decisions reiterate that 8(a) graduates are not eligible for new contracts or subcontracts. *See FTSI-Phelps JV*, SBA No. SIZ-5583, 2014 WL 4804769, at *8 & n.3 (Aug. 19, 2014) (noting that the procurement was a "total small-business set-aside, not a competitive 8(a) procurement" and even if it were the contractor "would not be eligible because it had graduated" before the offer deadline); *Reality Techs., Inc.*, SBA No. BDP-455, 2012 WL 8134444, at *2 n.2 (Nov. 21, 2012) (explaining that an 8(a) graduate is considered non-disadvantaged for purposes of regulatory restrictions on subcontracting). And the other dealt with an SBA decision to graduate a contractor from the 8(a) Program early. *David's Custom Roofing & Painting, Inc.*, SBA No. BDP-344, 2010 WL 8747273 (Mar. 16, 2010) (dismissing as moot an SBA size determination appeal because the contractor's "nine-year program term [had already] expired").

wrong for two reasons.  First, they contend that even if the District Court's ownership analysis was correct, its analysis is not enough to dismiss their claims because 13 C.F.R. § 124.515(a) applies to a change in ownership *or* a change in control.  That is, either can trigger contract termination and the court made no ruling on the divesture of Gose's control.[18]  Second, they assert that the complaint plausibly pled loss of unconditional ownership, pointing to the Right of First Refusal and Option Agreement and the Final MAS Agreement, the latter of which assigned 100% of DWG's revenue to GAIC and NASCO.  GAIC and NASCO adopt the District Court's analysis and provide no response to Relators' first point.  We agree with Relators.

13 C.F.R. § 124.515(a) mandates termination for the convenience of the Government "if one or more of the individuals upon whom eligibility for the 8(a) BD program was based relinquishes or enters into any agreement to relinquish ownership *or* control of the Participant." (emphasis added).  And 15 U.S.C. § 637(a)(21)(A) provides the same.  The loss of either unconditional ownership or control triggers mandatory termination, absent SBA approval of a

---

[18] Relators also argue that the complaint plausibly pled that Gose lost control of DWG because he: (1) was shut out of all significant decision-making and access to financial and contractual information; (2) lost control over DWG's board of directors; and (3) earned a salary that was less than two other non-disadvantaged individuals at DWG.  "Because the [D]istrict [C]ourt did not address these issues, we decline to do so here in the first instance." *See MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co.*, 40 F.4th 1295, 1306 (11th Cir. 2022).

waiver. *See Int'l Data Prods. Corp. v. United States*, 64 Fed. Cl. 642, 650 (2005). GAIC and NASCO do not refute this. And the District Court implicitly recognized this by analyzing both Relators' loss of control (i.e., that the loss-of-control provision did not apply) and ownership allegations.[19] Because neither the District Court nor GAIC and NASCO have articulated any other reasons for challenging Relators' allegations about control, and given our holding above that the provision applied, there is no dispute that Relators sufficiently pled that Gose lost the requisite control by November 15, 2012. We therefore need not address whether Relators also plausibly pled loss of ownership.[20]

---

[19] To put a finer point on this, the "or" in 13 C.F.R. § 124.515(a) and 15 U.S.C. § 637(a)(21)(A) must be disjunctive. As we and the Supreme Court have explained, "[t]he 'ordinary use' of 'or' 'is almost always disjunctive,' and *the words it connects are to be given separate meanings.*'" *Santos v. Healthcare Rev. Recovery Grp.*, 90 F.4th 1144, 1153 (11th Cir. 2024) (per curiam) (quoting *United States v. Woods*, 571 U.S. 31, 45 (2013)). True, "statutory context can overcome the ordinary, disjunctive meaning of 'or.'" *Encinco Motorcars, LLC v. Navarro*, 584 U.S. 79, 87 (2018); *Pulsifer v. United States*, 144 S. Ct. 718, 730–31 (2024) (noting that statutory construction can depend on "text in its legal context"). But context here reinforces the ordinary disjunctive meaning. Consider that admission to the 8(a) program requires both unconditional ownership *and* control by "one or more socially and economically disadvantaged individuals." 13 C.F.R. § 124.101; *id.* §§ 124.105 to .106. If both ownership and control are required for admission, loss of either warrants mandatory termination. Otherwise, as explained above, the purpose of the 8(a) program is easily thwarted. *See supra* Section III.B.1.i.

[20] Were we to address the ownership pleading issue it might be an alternative holding because it is unnecessary to decide this case. True, alternative holdings are permissible. *Cf. Bravo v. United States*, 532 F.3d 1154, 1162–63 (11th

iii.  The Fraudulent Inducement Theory

The District Court also dismissed Relators' false present-ment and false statement claims because those claims turned on a flawed fraudulent inducement theory.  Under the District Court's rationale, for false presentment claims "[t]he falsity or fraudulent conduct must . . . be found in a claim for payment."  *Native Am. Servs. Corp.*, 2022 WL 18932981, at *7.  And for false statement claims, there must be some "connection between the alleged false record or statement and an actual claim made to the government." *Id.* at *8.

Relators argue that this reasoning conflicts with decisions across the country—including the Supreme Court and our Court. Relators add that the FCA should be construed broadly as it was intended to cover all types of fraud that might result in loss to the Government, including fraudulent inducement.  GAIC and NASCO again adopt the District Court's reasoning.  And, relying on the Supreme Court's decision in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016), and our deci-sion in *Clausen*, they emphasize that Relators did not allege any af-firmative misrepresentations within the content of any task order

Cir. 2008) (explaining that alterative holdings "are as binding as solitary hold-ings"); *Hodges v. Att'y Gen., State of Fla.*, 506 F.3d 1337, 1348 (11th Cir. 2007) (reaching an alternative holding).  But they are "often just a bad idea" because they overstep the judiciary's role, increase the likelihood of arriving at an in-correct opinion, increase the perception of impartiality, and risk upsetting col-legiality.  *United States v. Files*, 63 F.4th 920, 933 (11th Cir. 2023) (Newsom & Tjoflat, JJ., concurring).

bids or payment claims. Relators have the more persuasive argument.

"The False Claims Act . . . is 'the Government's primary litigative tool for combating fraud' against the Government." *United States v. Corp. Mgmt., Inc. v. United States*, 78 F.4th 727, 732 (5th Cir. 2023) (quoting S. Rep. No. 99-345, at 2 (1986)). To be sure, the FCA "is not 'an all-purpose antifraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Escobar*, 579 U.S. at 194 (quoting *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008)). But "Congress wrote [the FCA] expansively, meaning 'to reach all types of fraud, without qualification, that might result in financial loss to the Government.'" *Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (quoting *United States v. Neifert–White Co.*, 390 U.S. 228, 232 (1968)). The question then is whether the FCA encompasses the type of fraud alleged by Relators here. Binding precedent from the Supreme Court and our Court provide the answer: yes.[21]

---

[21] Other circuits have gone so far as to recognize that "[t]he legislative history of the FCA also supports the conclusion that fraud-in-the-inducement is a recognized theory of liability under the Act." *In re Baycol Prods. Litig.*, 732 F.3d 869, 876 (8th Cir. 2013). When it amended the FCA in 1986, "Congress noted that, under FCA case law, 'each and every claim submitted under a contract . . . or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim.'" *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005) (quoting S. Rep. No. 99-345, at 9 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5274).

*See United States ex rel. Marcus v. Hess*, 317 U.S. 537, 543–44 (1943), *superseded in part on other grounds as noted in Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401 (2011); *Marsteller*, 880 F.3d at 1314–15.

The Supreme Court recognized this type of fraudulent inducement theory in *Hess*. There, electrical contractors colluded to ensure there would be no price competition on Public Works Administration (P.W.A.) projects. *Hess*, 317 U.S. at 543. In upholding the jury verdict for the relators, the Supreme Court explained that the

> fraud did not spend itself with the execution of the contract. Its taint entered into every swollen estimate which was the basic cause for payment of every dollar paid by the P.W.A. into the joint fund for the benefit of respondents. *The initial fraudulent action and every step thereafter taken, pressed ever to the ultimate goal—payment of government money to persons who had caused it to be defrauded.*

*Id.* at 543–44 (emphasis added).

We also recognized the viability of the fraudulent inducement theory in *Marsteller*, noting that the theory was derived from *Hess*. 880 F.3d at 1314–15. *Marsteller* centered on allegations that a helicopter manufacturer "omitted lower-dollar sales" when providing pricing data to the Army during the bid processes and failed to disclose conflicts of interest that "might have caused the Army to

accept an inflated contract price." *Id.* at 1305, 1315.[22]  Citing the same *Hess* passage above, we explained our understanding of the fraudulent inducement theory: "[t]he contractor's ultimate claims for payment were 'grounded in fraud' when the Government paid them, even though the 'fraud' occurred prior to the execution of the contract itself." *Id.* at 1314 (quoting *Hess*, 317 U.S. at 544).  That is, the "subsequent claims [were] false 'because of an *original fraud* (whether a certification or otherwise).'"  *Id.* (quoting *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1173 (9th Cir. 2006)).  On that logic, we agreed "that the allegations of the relators' complaint could support multiple theories of fraud in the inducement." *Id.*[23]

---

[22] The pricing data was "presumably [needed] to establish the commercial reasonableness of the price proposed in [the manufacturer's] bid." *Marsteller for use & benefit of the United States v. Tilton*, 880 F.3d 1302, 1305 (11th Cir. 2018). FAR 12.209 requires contracting officers to "establish price reasonableness" and advises them to "be aware of customary commercial terms and conditions when pricing commercial products." 48 C.F.R. § 12.209.  That often requires contracting officers to compare "proposed prices to historical prices paid, whether by the Government or other than the Government, for the same or similar items." *Id.* § 15.404-1(b)(2)(ii); *see also id.* §§ 13.106-3(a)(2)(ii), 14.408-2.

[23] We are not alone in our understanding of *Hess*. *See, e.g.*, *Harrsion v. Westinghouse Savannah River Co.*, 176 F.3d 776, 787–88 (4th Cir. 1999) (summarizing FCA cases and noting that FCA "liability attached . . . because of the fraud surrounding the efforts to obtain the contract or benefits status, or the payment thereunder"); *United States ex rel. Longi v. United States*, 575 F.3d 458, 468 (5th Cir. 2009) ("Under a fraudulent inducement theory, although the Defendants' 'subsequent claims for payment made under the contract were not literally false, [because] they derived from the original fraudulent misrepresentation, they, too, became actionable false claims.'" (alteration in original) (quoting

In rendering our opinion in *Marsteller*, we also explored the effect of the Supreme Court's opinion in *Escobar* because the relators' complaint *separately* alleged an implied false certification theory.[24]  *Id.* at 1311.  We found *Escobar* "helpful in assessing the relators' fraud in the inducement theory," but we were careful to note

---

*United States ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.*, 491 F.3d 254, 259 (5th Cir. 2007))); *United States v. United Techs. Corp.*, 626 F.3d 313, 319 (6th Cir. 2010) ("*Hess* establishes that an invoice, which itself does not contain a falsity, may supply the premise for a false claim if submitted in connection with a fraudulently obtained contract."); *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005) (implicitly recognizing a fraudulent inducement theory where a university lied in phase one of a two-phase application for grants, loans, and scholarships but was not paid until it submitted its phase two application); *In re Baycol Prods. Litig.*, 732 F.3d at 876 ("[W]hen a relator alleges liability under a theory of fraud-in-the[-]inducement, claims for payment subsequently submitted under a contract initially induced by fraud do not have to be false or fraudulent in and of themselves in order to state a cause of action under the FCA."); *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1173 (9th Cir. 2006) (describing *Hess* and explaining that the fraudulent inducement theory is viable because "subsequent claims are false because of an *original fraud*"); *United States ex rel. Cimino v. IBM Corp.*, 3 F.4th 412, 417 (D.C. Cir. 2021) ("Under longstanding Supreme Court precedent, a violation of the FCA occurs when a person fraudulently induces the government to enter a contract and later submits claims for payment under that contract.").

[24] As the Supreme Court described it, according to the implied false certification theory,

> when a defendant submits a claim, it impliedly certifies compliance with all conditions of payment.  But if that claim fails to disclose the defendant's violation of a material statutory, regulatory, or contractual requirement, . . . the defendant has

that it was "far from self-evident that . . . the court's assessment of the implied certification theory should control [the] disposition of the fraudulent inducement theory. Each theory of liability rests on different factual allegations." *Id*. at 1315. In the end, we remanded for two reasons. First, we remanded so that the district court could "consider whether to allow the plaintiffs to file a second amended complaint that conform[ed] its allegations to the requirements of *Escobar*." *Id*. And second, after "conclud[ing] that the complaint did plead fraud in the inducement, . . . we . . . remand[ed] so that the district court c[ould] reexamine the allegations relating to that theory." *Id*.

Under *Marsteller*, Relators' fraudulent inducement theory is actionable. Our discussion of the fraudulent inducement theory of FCA liability and the rationale that an "original fraud" renders future claims for payment false, was integral to the part of the decision to remand to the district court to assess the allegations pertaining to the relators' claims. We see no reason why this does not bind our decision here. *See United States v. Gillis*, 938 F.3d 1181, 1198 (11th Cir. 2019) (per curiam) ("The holding of a case comprises both the result of the case and those portions of the opinion necessary to that result." (quoting *United States v. Caraballo-Martinez*, 866 F.3d 1233, 1244 (11th Cir. 2017))).

---

made a misrepresentation that renders the claim 'false or fraudulent' under § 3729(a)(1)(A).

*Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 180 (2016).

GAIC and NASCO cannot sidestep *Marsteller* with *Escobar* or *Clausen*. To begin, if *Escobar* prohibited FCA claims based on a fraudulent inducement theory—like GAIC and NASCO suggest that it does—we would not have remanded in *Marsteller* to evaluate the fraudulent inducement claim. And it is unsurprising that we did so. *Escobar* dealt with the implied false-certification theory in which the relators alleged that a mental health facility submitted Medicaid reimbursement claims with misleading representations and omissions. 579 U.S. at 184–85. The essential element of the relators' claim was an implied false statement in the claims for payment. Fraudulent inducement was not at issue in the case. No part of the Supreme Court's analysis supports the proposition that a fraudulent inducement claim is viable only if the fraudulent activity is found in the claim for payment.

Likewise, GAIC and NASCO cannot rely on *Clausen* to save their argument. Of course, the "*sine qua non* of a False Claims Act violation" is the "submission of a claim." *Clausen*, 290 F.3d at 1312. Nothing in *Marsteller* displaces that requirement. What *Marsteller* tells us is that the alleged falsity does not have to appear in the claim itself and can instead be traced to the execution of the contract—or in this case, bidding on individual task orders.[25] In the end, GAIC and NASCO's attempt to make an end run around *Marsteller* does not hold up under scrutiny.

---

[25] Under 15 U.S.C. § 632(w)(2)(A), a bid on a contract set aside for small business concerns is deemed to be an "affirmative, willful, and intentional certification of small business size and status."

Contrary to the District Court's characterization, Relators' claims do not seek to use the FCA as an all-purpose antifraud statute. Relators seek to hold GAIC and NASCO accountable for alleged fraudulent conduct that caused the Government to award multiple task orders and pay millions of dollars to DWG instead of legitimate 8(a) contractors. That is well within the FCA's purview.

iv. Particularity

That brings us to the District Court's final reason for dismissing Relators' false presentment and false statement claims: Relators failed to plead fraud with particularity because they did not specify which bids or claims were supposedly fraudulent. Relators argue that because these claims are based on a fraudulent inducement theory, pointing to specific bids or task orders would not have added any particularity. Rather, by alleging the precise actions and events that made the bidding fraudulent (i.e., Gose's loss of ownership and control) and the details of the specific task orders that DWG fraudulently bid on, Relators contend that they have satisfied Rule 9(b). Relators add that, even if the precise details about the bids and claims are required, the allegations in the complaint give GAIC and NASCO more than enough information to put them on notice of the specific claims against them to prepare a defense.

GAIC and NASCO retort that the details Relators pled are of "no moment." Again relying on the District Court's reasoning, they contend Rule 9(b) requires details of the particular bids and claims. GAIC and NASCO further assert that even if the particularity focus should be on the fraudulent inducement allegations,

Realtors still failed to satisfy Rule 9(b) because Relators offered no details about the alleged duty to disclose DWG's ineligibility. Relators have the better arguments.

"[T]o satisfy Rule 9(b)'s heightened-pleading requirements, the relator must allege . . . particular facts about 'the "who," "what," "where," "when," and "how" of fraudulent submissions to the government.'" *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1052 (11th Cir. 2015) (citation omitted) (quoting *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (per curiam)). "Rule 9(b) serves two purposes: 'alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior.'" *United States ex rel. 84Partners, LLC v. Nuflo, Inc.*, 79 F.4th 1353, 1360 (11th Cir. 2023) (quoting *Clausen*, 290 F.3d at 1310). "This second purpose is 'especially important' in [FCA] cases filed by relators; in such cases the rule 'ensures that the relator's strong financial incentive to bring an FCA claim . . . does not precipitate the filing of frivolous suits.'" *Id.* (omission in original) (quoting *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 (11th Cir. 2006)).

That said, "a court considering a motion to dismiss for failure to plead fraud with particularity should always be careful to harmonize the directives of [R]ule 9(b) with the broader policy of notice pleading." *Friedlander v. Nims*, 755 F.2d 810, 813 n.3 (11th Cir. 1985), *abrogated on other grounds by Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541 (11th Cir. 2002) (en banc). Which is why a

sister circuit has aptly explained that a court should "hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).[26]

Relators' complaint satisfies these requirements. At its core, this is a fraudulent inducement case.[27] As the Eighth Circuit has explained, "a claim alleging fraud in the inducement of a government contract . . . focus[es] on the false or fraudulent statements which induced the government to enter into the contract at the outset." *In re Baycol Prods. Litig.*, 732 F.3d 869, 876 (8th Cir. 2013). When a relator alleges liability under a fraudulent inducement theory, "claims for payment subsequently submitted under a contract [or task order] initially induced by fraud do not have to be false or

---

[26] Requiring plaintiffs to have substantial prediscovery evidence of those facts prevents plaintiffs from "learn[ing] the complaint's bare essentials through discovery and . . . needlessly harm[ing] a defendant's goodwill and reputation by bringing a suit that is, at best, missing some of its core underpinnings, and, at worst, are baseless allegations used to extract settlements." *United States ex rel. Clausen v. Lab'y Corp. of Am., Inc.*, 290 F.3d 1301, 1313 n.24 (11th Cir. 2002).

[27] Although paragraph 208 of Relator's complaint suggests a separate implied false certification theory, Relators did not press this theory in response to GAIC's and NASCO's motions to dismiss. To the extent that Relators attempt to revive this theory in their reply brief, that attempt comes too late. *See NLRB v. Allied Med. Transp., Inc.*, 805 F.3d 1000, 1009 (11th Cir. 2015) ("Arguments made for the first time in the reply brief . . . are forfeited.").

fraudulent in and of themselves in order to state a cause of action under the FCA." *Id.*; *see also Harrison*, 176 F.3d at 788. Specifying individual bids or claims—which themselves may not contain false information—adds little, if any, particularity concerning "the circumstances constituting fraud" here. Fed. R. Civ. P. 9(b); *Cf. Clausen*, 290 F.3d at 1312 & n.21 (listing some types of information that might help a plaintiff plead a claim under the FCA with particularity but cautioning that Rule 9(b) "does not mandate all of this information for any . . . alleged claims"). Instead, these additional and unnecessary details contravene Rule 8's "short and plain statement" mandate.

As to the alleged fraudulent conduct, Relators' complaint sufficiently identifies the who, what, where, when, and how. The complaint identifies (1) who participated in the alleged fraud: GAIC and NASCO; (2) what the alleged fraudulent activity was: bidding on task orders and submitting claims while not disclosing DWG's inability to bid or seeking a waiver under 13 C.F.R. § 124.515(a)–(b); (3) details about where the alleged fraud took place: e.g., specific task orders that GAIC and NASCO fraudulently bid under, the contract numbers, places of performance, award dates, and end dates, and so on; (4) when DWG became ineligible to bid thereby rendering *any* later bids or claims to be false: November 15, 2012; and (5) how the alleged fraudulent activity occurred: GAIC and NASCO caused Gose to lose 51% unconditional ownership, control, or both, and that GAIC and NASCO were aware of the ramifications of this.

We fail to see how Relators' allegations are not enough to state a claim for relief under a fraudulent inducement theory. Unlike other fraudulent inducement FCA cases in which the allegations have "fallen short," here there is more than enough information to put GAIC and NASCO on notice of the specific claims against them and to allow them to prepare a defense. *See, e.g.*, *Clausen*, 290 F.3d at 1312 & n.21. GAIC and NASCO know the details of the alleged fraud, the precise contracts at issue, the places of performance, and the alleged date DWG became ineligible to bid. Nothing prevents GAIC and NASCO from reviewing the specific bids, task orders, and payment claims associated with those contracts to prepare a defense. And Relators have substantial pre-discovery evidence of those facts, as shown by the detailed complaint and accompanying exhibits. We therefore conclude that Relators' allegations comply with Rule 9(b).

## 2. Conspiracy Claims

Finally, we arrive at the District Court's dismissal of Relators' conspiracy claims. It did so because it found that Relators had failed to state a claim under § 3729(a)(1)(A)–(B) and failed to plead any conspiracy with particularity. Relators contend that their complaint pled conspiracy claims with particularity. They point to the complaint's allegations about communications and meetings between GAIC and NASCO to seize ownership and control over DWG and the Final MAS agreement, which memorialized the conspiracy. Again, GAIC and NASCO rely on the District Court's analysis. As we have already explained, we disagree with the District

Court's conclusion on Relators' § 3729(a)(1)(A)–(B) claims. So we limit our discussion here to why we agree with Relators that their conspiracy claims satisfy Rule 9(b).

As well as imposing liability for presenting false claims and making false statements, the FCA makes liable any person who "conspires to commit a violation of" the FCA. *See* 31 U.S.C. § 3729(a)(1)(C). To state a claim for conspiracy under the FCA,

> the plaintiff must show "(1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim."

*Corsello*, 428 F.3d at 1014 (quoting *United States ex rel. Stinson v. Provident Life & Accident Ins. Co.*, 721 F. Supp. 1247, 1259 (S.D. Fla. 1989)) (interpreting the pre-amendment version of the statute).[28] And, as with other FCA claims, "a plaintiff alleging a conspiracy to commit fraud must 'plead with particularity the conspiracy as well as the overt acts . . . taken in furtherance of the conspiracy.'" *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009) (omission in original) (quoting *FC Inv. Grp. LC v. IFX Markets, Ltd.*,

---

[28] As our Court has mentioned in an unpublished opinion, "it is not clear whether damages remain a required element under the new conspiracy provision following the 2009 amendments." *United States v. HPC Healthcare, Inc.*, 723 F. App'x 783, 791 n.4 (11th Cir. 2018). We need not answer that question because Relators have pled that the United States suffered damages.

529 F.3d 1087, 1097 (D.C. Cir. 2008), *overruled on other grounds by Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883 (D.C. Cir. 2021)).

Relators' complaint not only pleads these elements, but it does so with particularity by "alleg[ing] 'facts as to time, place, and substance of [GAIC and NASCO's] alleged fraud,' [including] 'the details of [GAIC and NASCO's] allegedly fraudulent acts, when they occurred, and who engaged in them.'" *Urquilla-Diaz*, 780 F.3d at 1051 (quoting *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 567–68 (11th Cir. 1994) (per curiam)). Relators' complaint alleges that through a series of emails (on August 3–6, 2012), phone calls (on August 6, 2012), and in-person meetings in Cincinnati (on August 8, 2012, and September 23, 2012), GAIC and NASCO formed a conspiratorial agreement to seize ownership and control of DWG, even going so far as to name the executives who orchestrated the agreement. The complaint alleges that the conspiracy was reduced to writing in the Final MAS Agreement, which was attached to the complaint. What's more, the complaint also alleges that GAIC and NASCO: (1) agreed not to notify or seek a waiver from the SBA; (2) instructed DWG not to notify the SBA and (3) agreed to and did bid on future task orders under the 8(a) contracts, despite the lack of waiver.

We are satisfied that Relators' complaint adequately states a claim for conspiracy under the FCA and does so with the particularity Rule 9(b) requires. As with Relators' false presentment and false statement claims, the complaint contains sufficient information on which GAIC and NASCO can prepare a defense. And,

like Relators' other claims, they have substantial prediscovery evidence of those facts, as shown by the complaint and exhibits.

## IV. Conclusion

We hold that, at this procedural stage, Relators' complaint plausibly alleges false presentment, false statement, and conspiracy claims under 31 U.S.C. § 3729(a)(1)(A)–(C) against GAIC and NASCO. We therefore reverse and remand this case to the District Court for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**